# EXHIBIT 11

FILED
DONNA McQUALITY
CLERK, SUPERIOR COURT
10/07/2021  5:42PM
BY: KBICKEL
DEPUTY

1
Marc J. Randazza (AZ Bar No. 027861)
RANDAZZA LEGAL GROUP, PLLC
2
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
3
Telephone: 702-420-2001
ecf@randazza.com
4

5
Attorneys for Defendants
Audrey Davis and John Doe Davis

6

**SUPERIOR COURT, STATE OF ARIZONA**
7
**IN AND FOR THE COUNTY OF YAVAPAI**

8

9
RHONDIE VOORHEES, an individual,                Case No. P1300CV202100396

10
            Plaintiff,                                          Dept. 2

11
      v.

12
AUDREY DAVIS and JOHN DOE                        **DEFENDANT AUDREY DAVIS'S**
DAVIS, husband and wife,                              **MOTION TO DISMISS**
13

14
            Defendant.

15
      Defendant Audrey Davis moves to dismiss the Complaint filed by Plaintiff Rhondie
16
Voorhees pursuant to Ariz. R. Civ. P. 12(b)(6). This Motion is based upon the attached
17
memorandum of points and authorities, the papers and pleadings on file herein, and any
18
oral argument permitted by this Court.

19
**1.0    INTRODUCTION AND STATEMENT OF RELEVANT FACTS**

20
      Defendant Audrey Davis is a student at Embry-Riddle Aeronautical University
21
("ERAU"), while Plaintiff Rhondie Voorhees is the Dean of Students at ERAU. (*See*
22
Verified Complaint and Application for Permanent Injunction ("Complaint"), at ¶¶ 8-9.)
23
Plaintiff alleges that, prior to her employment at ERAU, Defendant Davis filed a complaint
24
with ERAU under Title IX of the Education Amendments of 1972 ("Title IX") and that

25

1  Defendant was displeased with ERAU's investigation of that Title IX complaint.  (*See id.*

2  at ¶¶ 10-11.)

3      Plaintiff additionally alleges that she met with Defendant Davis about the Title IX

4  complaint in or about September of 2020. Specifically, Defendant Davis wanted to discuss

5  the fact that her abuser had been assigned to attend the same class as her and that ERAU

6  could improve its Title IX processes and procedures. (*See* Exhibit 1 to Complaint.) Plaintiff

7  alleges that she told Ms. Davis that she had nothing to do with "overseeing or supervising

8  any Title IX issues at ERAU."[1] (*See id.* at ¶¶ 12-13.) Following that meeting, Plaintiff

9  Voorhees alleges that, on February 15, 2021, Ms. Davis "published several false and

10 defamatory statements" in a petition posted on Change.org (the "Petition"). (*See id.* at

11 ¶ 18.) Plaintiff Voorhees attached the Petition as **Exhibit 1** to her Complaint.

12     Plaintiff alleges that these statements in the Petition were false and defamatory:

13     • That Ms. Davis falsely stated that Plaintiff was responsible for the length of

14 her Title IX investigation and for how things were handled post-investigation

15 (Complaint, ¶ 19);

16     • That Plaintiff was asked to leave her position at the University of Montana

17 for creating a culture regarding how the university handled rape, when the University

18 of Montana allegedly only terminated her because the position was eliminated

19 (Complaint, ¶¶ 20-21);

20     • That there were 80 rapes while Plaintiff Voorhees oversaw students at the

21 University of Montana with only one convicted (Complaint, ¶ 22);

22     • That Plaintiff was responsible for overseeing Title IX matters at the

23 University of Montana (Complaint, ¶ 23); and

24 _____

[1]   Plaintiff does not explain why Defendant should have taken her at her word, nor
25 does Plaintiff explain how the Dean of Students has absolutely no part in Title IX matters.

RANDAZZA | LEGAL GROUP

1    • That Plaintiff forced a trans student to drop out after the student came out,

2    when the trans student was dismissed for other reasons (Complaint, ¶¶ 25-26).

3         Plaintiff additionally accuses Ms. Davis of emailing the Petition to 74 students and

4    faculty at ERAU (Complaint, ¶ 28), of posting on Facebook that Plaintiff mismanaged her

5    Title IX case (Complaint, ¶ 29), and of creating "at least four memes" about Plaintiff.

6    (Complaint, ¶ 30). Plaintiff acknowledges that Ms. Davis deleted the Petition on February

7    21, 2021, less than a week after it was created. (*See* Complaint, at ¶ 35.)

8         In the Petition, which is attached to the Complaint as Exhibit 1, Defendant Davis

9    discloses in plain English, "I am biased on this topic" and suggested that readers do their

10   "own research." (Exhibit 1 to Complaint.) Defendant Davis also posted links to news

11   articles and to a Supreme Court brief from which she drew her conclusions. (*See id.*) These

12   links are in the Petition that Plaintiff attached to her Complaint and included the following:

13   • Plaintiff Voorhees made a trans student drop out of the University of

14   Montana after the student came out, accusing the student of violating the code of

15   conduct    six    months    earlier.    (https://billingsgazette.com/news/state-and-

16   regional/montana/transgender-student-drops-out-alleges-discrimination-at-missoula-

17   college/article_a57b17cd-4b32-5be1-8a61-3201439a137d.html);[2] and

18   • Plaintiff Voorhees was asked to leave the University of Montana

19   (https://missoulian.com/news/local/university-of-montana-dean-of-students-asked-to-

20   leave/article_cbcd2362-f723-5c73-9e8f-e88a6835d705.html).[3]

21

22   [2]   This link resolves to an article by Keila Szpaller for the *Billings Gazette* titled

23   "Transgender student drops out, alleges discrimination at Missoula College," dated August
     9, 2015, attached as **Exhibit A**.

24   [3]   This links resolves to an article by Kelia Szpaller for the *Missoulian* titled
     "University of Montana Dean of Students asked to leave," dated August 20, 2018, attached

25   as **Exhibit B**.

RANDAZZA | LEGAL GROUP

1   Thus, at least two of the allegedly defamatory statements made by Ms. Davis were included

2   in news articles from reputable sources, upon which Ms. Davis had every right to rely.  Ms.

3   Davis took reliable news accounts, court briefing and other reliable information and shared

4   it with her classmates, showing the receipts, and exhorting them to keep her bias in mind

5   and to explore her sources for themselves.[4]

6          With regard to Ms. Davis' allegedly defamatory statements in the Petition regarding

7   Plaintiff Voorhees' oversight of Ms. Davis' Title IX complaint, Plaintiff Voorhees states

8   that Defendant Davis "falsely implied" that Plaintiff Voorhees was "responsible for

9   Defendant's investigation taking over 150 days" and for "how things were handled post-

10  investigation." (*See* Complaint, at ¶ 19.) However, Plaintiff Voorhees attached the Petition

11  to her Complaint.  It does not say what she alleges it says.

12         In her Petition, Ms. Davis states that she met with Plaintiff Voorhees because she

13  was placed in a class with her abuser. She did not state that Plaintiff Voorhees conducted

14  the investigation or was responsible for its aftermath. Defendant Davis specifically wrote:

15         When I had a meeting with the Dean, I told her how it was very traumatic to
16         see that I was put in a class with my abuser and suggested that there be an
          early warning system put in place for both parties, so they don't have the
17         possibility of showing up to class and being forced to interact. She said that
          would take a lot of work, and never got back to me.

18  _____

19  [4]    The Court may properly consider these documents and others cited in Defendant's
    petition without converting this motion to a motion for summary judgment, as the petition
20  is attached to the Complaint and documents attached to a complaint are not "outside the
    pleadings" for purposes of a Rule 12(b)(6) motion. *See Strategic Dev. & Constr., Inc. v.*
21  *7th & Roosevelt Partners, LLC*, 224 Ariz. 60, 63 (App. 2010).  Furthermore, a court may
    consider documents that are matters of public record on a Rule 12(b)(6) motion.  *Id.* at
22  1050 (finding that lien which had been recorded in County Recorder's Office was a matter
    of public record).  Finally, a court may consider matters that, "although not appended to
23  the complaint, are central to the complaint," such that "'the plaintiff obviously is on notice
    of the contents of the document, and the need for a chance to refute evidence is greatly
24  diminished.'" *Id.* (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998
    F.2d 1192, 1196-97 (3d Cir. 1993)).
25

- 4 -
Motion to Dismiss

RANDAZZA | LEGAL GROUP

1   (*Exhibit 1* to Complaint.)  Ms. Davis did not say that Plaintiff Voorhees was responsible

2   for her Title IX investigation nor its aftermath. She merely stated that she made suggestions

3   to Plaintiff Voorhees for making ERAU's Title IX process better and that Plaintiff never

4   got back to her. Notably, Plaintiff does not allege that this was defamatory.

5          In fact, Defendant Davis's meeting with Plaintiff to discuss being placed in a class

6   with her abuser fits squarely within Plaintiff's job description. The ERAU website states

7   that Plaintiff Voorhees, as Dean of Students, is responsible for "providing services,

8   resources, and advocacy for all of our students to promote an ethical community through

9   fundamental fairness, mutual respect, personal accountability, and responsible citizenship.

10  (*See* Meet the Dean of Students, Embry-Riddle Aeronautical University Website, attached

11  as **Exhibit C**.)[5] Ms. Davis came to Plaintiff Voorhees to discuss her specific issues and

12  gave Plaintiff suggestions for improvements.  However, Dean Voorhees ignored her

13  concerns, an assertion that Plaintiff does not contest.

14         Moreover, several of the articles Ms. Davis cited in her Petition themselves relied

15  upon a 2015 nationally bestselling book published by well-known investigative reporter

16  Jon Krakauer entitled *Missoula: Rape and the Justice System in a College Town*. Mr.

17  Krakauer's book contradicts Plaintiff Voorhees' assertions that she did not oversee Title

18  IX claims at the University of Montana. Mr. Krakauer discusses a Title IX case at the

19  University of Montana where an independent consultant found that the accused's testimony

20  was not credible and that there was clear and convincing evidence that he raped the victim.

21  (*See* Krakauer, John, *Missoula: Rape and the Justice System in a College Town*, at 206

22  (2015)).  However,  Plaintiff  Voorhees  "rejected  the  independent  consultant's

23  determination" and concluded that the accused was not guilty of rape pursuant to Title IX.

24  _____

25  [5]   Available at: https://prescott.erau.edu/campus-life/dean-of-students (last accessed
    Oct. 7, 2021).

1    (*See id.* at 207.)  This garnered widespread criticism.  Nobody has so much as suggested

2    that Krakauer's book was wrong, or even unreliable.  Further, a reasonable person like

3    Defendant has a right to presume that a best-selling book went through an editorial process

4    to vet its facts.

5           Moreover, while Plaintiff Voorhees claims *in this lawsuit* that it was defamatory to

6    say that she oversaw Title IX claims at the University of Montana, she made very different

7    claims in a lawsuit filed in the U.S. District Court for the District of Montana entitled *Cole,*

8    *et al. v. Montana Univ. Sys.*, Case No. CV-21-88-M-BMM. On August 19, 2021, the

9    plaintiffs, which include Plaintiff Voorhees, filed a First Amended Complaint, which is

10   attached as **Exhibit D**. In that pleading, Ms. Voorhees alleges:

11          • That as Dean of Students at the University of Montana, she was "a member

12   of the Title IX case review team" (**Exhibit D**, ¶ 114);

13          • That she was hired by the University of Montana while the federal

14   government investigated the school's sexual assault scandal, participated in policy

15   revisions to the school's Title IX policy, and "evaluated past and present student cases"

16   regarding Title IX (**Exhibit D**, ¶¶ 117-118);

17          • That the University of Montana minimized or disregarded her Title IX

18   reports to the university (**Exhibit D**, ¶ 120);

19          • That her efforts to "fulfill her obligations under Title IX" led to the

20   elimination of her position and employment with the University of Montana

21   (**Exhibit D**, ¶ 123);

22          • That the elimination of her position was a "pre-text" to terminating her

23   employment (**Exhibit D**, ¶ 125); and

24

25

- • That the University of Montana "unnecessarily humiliated" Plaintiff when it terminated her position and retaliated against her for her handling of Title IX issues (**Exhibit D**, ¶ 126).

Therefore, in the case here in Arizona, Ms. Voorhees alleges that she had no Title IX oversight responsibilities at the University of Montana.  Meanwhile, in the case filed in Montana on or about May 14, 2021, she contradicts these allegations.   Perhaps most egregiously, in the Montana action, she states that ***"[a]s a result of [the University of Montana's] mishandling of Dr. Voorhees' termination, she has been defamed by a student in Arizona and her reputation and career have been forever tarnished."*** (**Exhibit D**, ¶ 130. (emphasis added)). In other words, Plaintiff Voorhees admits that Ms. Davis was relying upon statements made by the University of Montana when she allegedly defamed Plaintiff, negating any possibility that Ms. Davis published with actual malice. There is no reason that Ms. Davis should not have been permitted to rely upon assertions made by the University of Montana.  In fact, if Ms. Davis' petition was false, then it must mean that Dean Voorhees has been less than candid with the District of Montana.  She cannot be telling the truth in both cases.

Nothing Ms. Davis did defamed Plaintiff Voorhees. She was relying upon reports from a major American university (at Plaintiff's own admission) and upon reputable sources about Plaintiff Voorhees – all of which comported with her personal experiences with Dean Voorhees. This Complaint should be dismissed with prejudice.

**2.0   STANDARD OF REVIEW**

Pursuant to Rule 12(b)(6) of the Arizona Rules of Civil Procedure, a motion to dismiss may be granted "if as a matter of law plaintiffs would not be entitled to relief under any interpretation of the facts susceptible to proof." *Conklin v. Medtronic, Inc.*, 245 Ariz.

501, 504, ¶ 7 (2018). The Court must assume the truth of well-pled factual allegations, but not "allegations consisting of conclusions of law, inferences or deductions that are not necessarily implied by well-pleaded facts, unreasonable inferences or unsupported conclusions from such facts, or legal conclusions alleged as facts." *Jeter v. Mayo Clinic Ariz.*, 211 Ariz. 386, 389, ¶ 4 (App. 2005).

When a complaint implicates fundamental rights, like First Amendment rights, a court should examine the complaint with a more rigorous eye in order not to burden public debate with insupportable litigation. *Amcor Inv. Corp. v. Cox Ariz. Publications*, 158 Ariz. 566, 568, 764 P.2d 327, 329 (Ariz. Ct. App. 1988) (*citing* 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1357 at 610 (1969).

## 3.0    LEGAL ARGUMENT

### 3.1    Plaintiff's Defamation Claim Fails as a Matter of Law

Arizona courts consider three factors to determine if a statement can be defamatory: "(1) whether the words would be understood in a defamatory sense, (2) whether the statements were made in public debate, a heated labor dispute, or other circumstances in which fiery rhetoric is expected, and (3) whether the language of the statement is more likely to be understood as a statement of opinion than of fact." *Amcor Inv. Corp.*, 158 Ariz. at 570 (*citing Lewis v. Time, Inc.*, 710 F.2d 549, 553 (9th Cir. 1983)). Further, "statements that can be interpreted as nothing more than rhetorical political invective, opinion, or hyperbole are protected speech, but false assertions that state or imply a factual accusation may be actionable." *Desert Palm Surgical Group, PLC v. Petta*, 343 P.3d 438, 449 (Ariz. Ct. App. 2015) (*summarizing Yetman v. English*, 168 Ariz. 71 (1991)).

### 3.1.1   Plaintiff is a public figure and is subject to the "actual malice" standard, which she cannot meet.

Because of its potential to chill public debate, "the First Amendment demands more stringent proof of wrongdoing when (public figures) sue their detractors." *Flowers v. Carville*, 310 F.3d 1118, 1129-30 (9th Cir. 2002); *see Lewis v. Oliver*, 178 Ariz. 330, 675 (Ct. App. 1993). A public figure is anyone who "voluntarily injects himself or is drawn into a particular public controversy." *Carville*, 310 F.3d at 1129 (*citing Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)) (emphasis added). A public figure plaintiff must show that the defendant acted with "actual malice" – "that is 'knowledge that [a statement] was false' or 'reckless disregard of whether it was false or not.'" *Id.* at 1129 (*citing N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). "This burden must be satisfied by clear and convincing evidence." *Id.* at 1129 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986)); *see Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984); *see also Morris v. Warner*, 160 Ariz. 55, 63 (Ct. App. 1988).

Determining whether a plaintiff is a public figure "is not a matter of state substantive law, but rather a pure constitutional question." *Makaeff v. Trump Univ., LLC,* 715 F.3d 254, 270 (9th Cir. 2013) (*citing Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351-52 (1974)). In considering whether a party is a limited purpose public figure, courts will consider whether (i) a public controversy existed when the statements were made, (ii) whether the alleged defamation is related to plaintiff's participation in the controversy, and (iii) whether the plaintiff voluntarily injected herself into the controversy for the purpose of influencing the controversy's ultimate resolution. *See id.* at 266; *see also Dombey v. Phoenix Newspapers*, 150 Ariz. 476, 483 (1986).

Here, Plaintiff Voorhees cannot be credibly called a "general purpose public figure." She is not famous throughout the country across all strata of society. However, she is

certainly a limited purpose public figure. The mayor of a small town is not a general-purpose public figure, but would certainly be a public figure for any matter involving town government. *See, e.g., Fasi v. Gannett Co.*, No. 96-15129, 1997 U.S. App. LEXIS 12445, *2 (9th Cir. May 27, 1997) (noting that mayor of Honolulu was public figure in defamation case brought against defendants who claimed he committed extortion and blackmail). Similarly, if there is a major controversy in that town's government, then that mayor's notoriety and zone of "public figure status" would expand. *Id*. Or, even if a person is not at all in government, but merely happens to be sucked into a public controversy, they will be a public figure for the purposes of that particular controversial subject, as a limited purpose public figure is a person who has been "drawn into a particular public controversy." *Flowers*, 310 F.3d at 1129.

Just by virtue of being the dean of a major university, Plaintiff is a public figure when it comes to any matters of governance of that university. *See, e.g., Hicks v. Stone*, 425 So. 2d 807, 813, 1982 La. App. LEXIS 8850, *15 (Oct. 21, 1982) (former dean held to be public figure with regard to his involvement with the university and defamation verdict reversed due to lack of actual malice); *Byers v. Southeastern Newspapers Corp.*, 288 S.E.2d 698, 701 (Ga. Ct. App. 1982) (Plaintiff, a college dean, was held to be "at the very least, a limited-purpose 'public figure'" for actual malice analysis purposes); *Van Dyke v. Katz*, 663 P.2d 52 (Utah 1983) (college director of financial aid was a public official due to ability to direct state funds and he was in a position that invited public scrutiny); *Walko v. Kean College of N.J.*, 235 N.J. Super. 139, 561 A.2d 680 (1988) (assistant dean was a limited-purpose public figure in the context of the college community); *Lewis v. Univ. Chronicle*, 2008 Minn. App. Unpub. LEXIS 210 (Jan. 25, 2008) (College professor was a public figure when there was a public controversy

RANDAZZA | LEGAL GROUP

1   pertaining to claims of anti-Semitism, and discrimination at the university); *Johnson v.*

2   *Board of Junior College District # 508*, 31 Ill.App.3d 270, 334 N.E.2d 442, 447 and n. 1

3   (App. Ct. 1975) (plaintiff college teachers "clearly had become public figures within the

4   Wilson College Community"); *Della-Donna v. Gore Newspapers Co.*, 489 So. 2d 72, 77,

5   1986 Fla. App. LEXIS 7454, *16 (Fla. 4th DCA 1986) (private university trustee found to

6   be public figure); *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 504-505, 2010 U.S. Dist.

7   LEXIS 23491, *133 (E.D. Pa. 2010) (Plaintiff is a limited purpose public figure with

8   respect to statements involving the administration of a South African private girls' school

9   as the statements related to the safety and treatment of the students).  Dean Voorhees is not

10  merely a public figure when it comes to her tenure at the University of Montana, but nearly

11  any controversy involving students at Embry Riddle would find the Dean of Students at

12  that university as a limited purpose public figure.

13      The controversy here is how Dean Voorhees handled a sexual assault scenario at

14  Embry Riddle.  Her handling of this kind of thing at the University of Montana is certainly

15  fair game. Her handling of Title IX matters at the University of Montana was covered

16  extensively in media and in a nationally bestselling book by Jon Krakauer. She has filed

17  two lawsuits – this one and the Montana federal case against the University of Montana –

18  touting her knowledge and importance in Title IX disputes. (*See* **Exhibit D**.) She can hardly

19  claim that her record on Title IX issues is not a matter of public concern, especially when

20  tied to a Title IX issue at one of the largest educational institutions in this county where

21  she chose to sue.

22      Additionally, Plaintiff has inserted herself into Title IX discussion and claims to be

23  instrumental with regard to the current interpretation of Title IX, alleging in the Montana

24  case that she participated in drafting the "last historical reflection on Title IX" in 2002.

25

(**Exhibit D**, ¶ 113.) She additionally alleged in that lawsuit that she was a key member of the Title IX team at the University of Montana, and her tenure was at a time when the university was in the news for its allegedly faulty Title IX investigations and when a bestselling author was writing a book about Title IX violations at the University of Montana. (*See id.* at ¶ 114.)

Furthermore, the issues raised in Ms. Davis' Petition relate to matters of public debate. Title IX and the subject of sexual assault on college campuses have been at the forefront of public discourse for years.  In the Montana First Amended Complaint, Plaintiff Voorhees acknowledges that the University of Montana's adherence to Title IX resulted in vigorous public debate and the publication of Mr. Krakauer's bestselling book. (*See* **Exhibit D**, ¶¶ 25-28.) She can hardly now claim to be a mere private figure on this subject. In fact, she should be estopped from asserting such a position, unless she is prepared to stipulate that she was not truthful in the Montana litigation.

For purposes of the subject matter of this litigation, Plaintiff Voorhees is a limited purpose public figure. She voluntarily interjected herself into a fiercely public debate. She is the de-facto "mayor" of a population at Embry Riddle. She can claim that she has no involvement in applying Title IX policies, but this is like a mayor claiming that they have no part in law enforcement issues, when the chief of police reports to that mayor. If the buck does not stop with the Dean, with whom does it stop?

Since she is a public figure many ways over, in this geographic area, in the context of the Embry-Riddle community, and in some capacity, nationwide when it comes to Title IX issues, she must meet the actual malice standard, by clear and convincing evidence, in order to prevail in this case. The complaint, plus documents of which the Court may take

1    judicial notice[6] or otherwise may consider on a motion to dismiss, demonstrate that she

2    could never meet that standard.

3         Ms. Davis took her statements from reliable news articles and a bestselling book

4    when examining Dean Voorhees's record. Plaintiff herself alleges that Defendant Davis

5    relied upon statements made by the University of Montana – a governmental entity – when

6    she allegedly defamed Dean Voorhees. When she applied this public information, this

7    governmental and journalistically vetted information, she applied it to her own personal

8    experience – which was consistent with Dean Voorhees' existing reputation as someone

9    who is soft on campus sexual assault.

10        Ms. Davis' statements regarding the results of her meeting with Plaintiff Voorhees

11   are not defamatory. Ms. Davis did not state or imply that Plaintiff handled her Title IX

12   investigation or its aftermath (although, even if she did, such a statement would not be

13   capable of a defamatory meaning – unless a mayor would be deemed to have absolutely

14   nothing to do with a small town's police issues, for example). Rather, Ms. Davis only states

15   in the Petition that she did not like being in a class with her abuser and provided suggestions

16   for ensuring that does not happen to other people. She further states that Plaintiff Voorhees

17   ignored her suggestions, which Plaintiff does not contend was defamatory.

18        In fact, Plaintiff only successfully alleges that Defendant Davis knowingly falsely

19   stated that Plaintiff Voorhees was "involved in" Title IX activity. However, that statement

20   on its own is not defamatory. Plaintiff acknowledges that Defendant Davis did not know

21   her statements about Plaintiff Voorhees' responsibilities regarding Title IX at ERAU were

22

23        _____

     [6]   Ariz. R. Evid. 201(b) permits a court to take judicial notice "of a fact that is not
24   subject to reasonable dispute because it: (1) is generally known within the trial court's
     territorial jurisdiction; or (2) can be accurately and readily determined from sources whose
25   accuracy cannot reasonably be questioned."

1  false when made.[7] Further, it bends the mind to accept the proposition that the Dean of

2  Students is entirely insulated from, and without any power or influence over, Title IX issues

3  at her university. Even if Embry-Riddle has a unique structure where the Dean is somehow

4  isolated from this important campus issue, it would not be a "reckless disregard for the

5  truth" to presume that she must have *some* influence over that process. Voorhees is not the

6  janitor, nor a grad student teaching assistant – she is the *Dean of Students*.

7      Finally, in the Petition, Defendant admitted that she was "biased" and encouraged

8  everyone receiving the Petition to do independent research.  She did not tell her readers to

9  rely upon what she said, acknowledging that her bias may have affected her words.  When

10  deciding whether a statement is one of fact or opinion, courts afford "great weight to the

11  context in which the statements are made." *Amcor Inc. Corp.*, 158 Ariz. at 570-71 (Ct. App.

12  1988). In *Rogers v. Mroz*, for example, the court found that political ads were more likely

13  to be viewed as statements of pure opinion precisely because "reasonable listeners of such

14  content 'expect to hear a great deal of opinion'" rather than fact. 250 Ariz.319, 331 (Ct.

15  App. 2020).  While Ms. Davis's petition may not have been a campaign ad, she explicitly

16  told her audience that she was biased, thus setting expectations of factual objectivity

17  comparable to a campaign ad.  Further, when a sexual assault victim is advocating for

18  herself, she should be expected to engage in some "firey rhetoric."  If such rhetoric is

19  expected in a labor dispute, it should be expected tenfold when someone is commenting on

20  dissatisfaction with how a public figure handled an event so rife with trauma as this.

21

22

23      [7]   Plaintiff also notes that Defendant took down the petition when told they were false.
    However, as a "subsequent remedial measure" which Davis did only to try to avoid
24  litigation, it should not be considered by this Court to be any kind of an admission as to
    liability.  *See* Ariz. R. Evid. 407.  However, the Court can (should damages ever be an
25  issue) consider this as a mitigating factor.

### 3.1.2  Ms. Davis' statements are fair reports of other commentaries on Plaintiff's actions.

Even if Plaintiff's factual assertions could facially meet her pleading burden for her defamation claim, "[r]eliance on reports of reputable news organizations cannot constitute actual malice as a matter of law." *Flowers,* 310 F.3d at 1130; *see Wilson v. Phoenix Newspapers Inc.*, 2021 Ariz. App. Unpub. LEXIS 155, *23-26 (Ct. App. Feb. 10, 2021) (finding lack of actual malice where defendant's pre-publication investigation included reliance on contemporaneous news articles).  A defamation defendant against a public figure plaintiff cannot be liable unless she "knew the news reports were probably false or had some obvious reason to doubt their accuracy." *Id.* at 1129; *see also Mt. Hood Polaris, Inc. v. Martino (In re Gardner)*, 563 F.3d 981, 989 (9th Cir. 2009); *Dombrey v. Phoenix Newspapers*, 150 Ariz. 476, 488 (1986) (finding that "failure to investigate, sloppy investigation, poor reporting practice and the like are not per se actual malice"); *Scottsdale Pub. v. Superior Court*, 159 Ariz. 72, 86 (Ct. App. 1988) (noting that actual malice is subjective and "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing").

Defendant Davis' alleged statements about Plaintiff's Title IX responsibilities at the University of Montana came from reputable newspapers – The Missoulan and Billings Gazette – and a nationally bestselling book by a world-renowned author. Defendant Davis had the right to trust these sources.  *Wilson*, 2021 Ariz. App. Unpub. LEXIS 155 at *23-26.  Finally, in the subsequently filed Montana case, even Plaintiff acknowledges that Ms. Davis was relying upon statements from the University of Montana when she allegedly defamed Plaintiff Voorhees.

> 130.   As a result of Defendants' mishandling of Dr. Voorhees's termination, she has been defamed by a student in Arizona and her reputation and career have been forever tarnished.

(**Exhibit D** at ¶ 130.)  Given that no cognizable theory exists as to why Ms. Davis should not have been permitted to rely upon reputable news sources and Plaintiff's former employer, a nationally known university, Plaintiff's defamation claim should be dismissed with prejudice.

### 3.2   Plaintiff's False Light Claim Fails as a Matter of Law

Pursuant to Arizona common law, the tort of false light invasion of privacy occurs when the defendant "gives publicity to a matter concerning another that places the other before the public in a false light." *Godbehere v. Phoenix Newspapers*, 162 Ariz. 335, 338, 783 P.2d 781, 784 (Ariz. 1989). The defendant is liable if (i) the false light would be offensive to a reasonable person, and (ii) the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter. *See id.* Unlike defamation, false light protects the plaintiff's mental and emotional interests, not her reputation or good name. *See id.* at 341; 783 P.2d at 786. To qualify, the publication must involve a major misrepresentation of the plaintiff's character, history, activities, or beliefs, not merely minor or unimportant inaccuracies. *See id.*

In the Montana matter, Plaintiff admitted that, even if Defendant's statements could reach the level of false light invasion of privacy, she took those statements from the University of Montana's mishandling of her termination.  (**Exhibit D** at ¶ 130.)  Given that there exists no reason why Defendant should not have been permitted to rely upon the statements of a major educational institution run by the Government of the State of

Montana, she could not have acted with the requisite "knowledge" or "reckless disregard" with regard to the truth or falsity of her statements. *Wilson*, 2021 Ariz. App. Unpub. LEXIS 155 at *23-26.

Moreover, most of Defendant's allegedly untrue statements were taken from newspapers and from a nationally bestselling book by a famous author. The only untrue statement that Defendant Davis *might* have made is that Plaintiff oversaw ERAU's Title IX program.  Even if that was false, it would not be offensive to a reasonable person to say that someone held a prominent position at a university. This claim should be dismissed with prejudice.

### 3.3    Plaintiff's Tortious Interference Claim Fails as a Matter of Law

To establish a *prima facie* case for intentional interference, Plaintiff must prove: (1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of the relationship or expectancy; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *See Antwerp Diamond Exch. v. Better Business Bureau,* 130 Ariz. 523, 529-30 (1981). In addition, the interference must be "improper as to motive or means" before liability will attach. *Wagenseller v. Scottsdale Mem. Hosp.*, 147 Ariz. 370, 388 (1985). These elements are the same whether the claim is described as Tortious Interference with Current or Prospective Business Relationships. *See Samaritan Health Sys. v. Superior Court*, 194 Ariz. 284, 294 (Ariz. Ct. App. 1998).

First, Plaintiff Voorhees has not sufficiently alleged valid contractual relationships or business expectancies. She merely alleges that she has "existing business relationships with individuals, organizations, and entities related to her profession" and that she has "a

1 reasonable expectation of future business relationships with existing colleagues and others

2 with whom Plaintiff does business or with whom Plaintiff may reasonably expect to do

3 business." (Complaint, at ¶¶ 72-73.)

4      With regard to her alleged current business relationships, she does not identify who

5 those relationships are with or what they are regarding. Even disregarding that she provides

6 no allegations that Defendant should have been aware of these unidentified relationships,

7 she does not plead that any damage has occurred to these supposed relationships. She

8 acknowledges in the Complaint that she is still employed by ERAU and does not identify

9 any harm that has resulted from Defendant's petition. (*See* Complaint, at ¶ 8.)

10      Finally, Plaintiff has not alleged facts that could establish impropriety under

11 Arizona common law. The purpose of Defendant Davis's statements was to alert the ERAU

12 student body regarding Plaintiff's handling of Title IX complaints at her former job at the

13 University of Montana. Her allegations were made after reviewing news articles and the

14 contents of a bestselling book by a world-renowned author. Defendant reasonably relied

15 on those published statements. Moreover, she also reasonably relied upon statements made

16 by the University of Montana when it terminated Plaintiff's employment. In her action

17 against the University of Montana, Plaintiff acknowledges that Defendant's statements

18 arose from the University of Montana's actions at the time of her termination.

19      Based upon all of the facts presented, Defendant did not know that she was

20 interfering with any of Plaintiff's current or prospective business relationships. Moreover,

21 she did not present the facts in the Petition for an improper purpose. This claim should be

22 dismissed.

23

24

25

RANDAZZA | LEGAL GROUP

### 3.4    Permanent Injunction Is Not a Cause of Action.

Plaintiff finally asks this Court for a permanent injunction demanding a retraction and prohibiting Defendant from discussing Dean Voorhees online. Setting aside the breathtakingly unconstitutional nature of a permanent gag order on Davis – barring her from even talking about the Dean of her university online, this is not even a properly pled claim. A request for injunction is not a cause of action. *See Colonial Sav. FA v. Gulino*, 2010 U.S. Dist. LEXIS 49755, at *8 (D. Ariz. May 19, 2010). Rather, an injunction is "merely [a] remed[y] that must be premised on some other legal theory." *Id.*; *see also Robinson v. BAC Home Loans Serv., LP*, 2012 U.S. Dist. LEXIS 60515, at *3 D. Ariz. May 1, 2012). A cause of action for an injunction "is unnecessary where an adequate remedy exists under some other cause of action." *Mangindin v. Washington Mut. Bank*, 637 F. Supp. 2d 700, 707 (N.D. Cal. 2009). This claim fails as a matter of law and must be dismissed by this Court.

### 4.0    CONCLUSION

Plaintiff has failed to plead any legally cognizable claims against Ms. Davis. Rather, she has filed this suit in a misguided attempt to shut down public criticism of her employment practices. For the foregoing reasons, this Court should grant the instant Motion and dismiss all of Plaintiff's claims with prejudice.

### **GOOD FAITH CONSULTATION CERTIFICATE**

Undersigned counsel for Defendant Audrey Davis certifies under Ariz. R. Civ. P. 7.1(h) and 12(j) that he tried in good faith to resolve the issues in this Motion by attempting to confer with counsel for Plaintiff Rhondie Voorhees on October 7, 2021. The undersigned invited Plaintiff's counsel to discuss the issues in this Motion, but Plaintiff's counsel

refused to confer either in person or telephonically. In person would have been impractical in any event. Further, Plaintiff's counsel's declination is not a surprise.  Normally, the meet and confer over a 12(b)(6) motion is calculated to allow the Plaintiff to amend the complaint, to lessen the burden on the court to decide a motion to dismiss that could be cured with leave to amend.  In this case, not only could leave to amend not cure the issues, but since Plaintiff is doubling-down on efforts to default the Defendant, an amended complaint would re-start the clock for a response. Accordingly, one cannot consider the refusal to meet and confer to be illogical or unprofessional, it appears to be an action calculated to zealously represent the Plaintiff's interests.

Dated: October 7, 2021.                Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza (AZ Bar No. 027861)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117

Attorneys for Defendants
Audrey Davis and John Jacob Howe

Case No. P1300CV202100396

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 7th day of October 2021, I served a true and correct copy of the foregoing document via the Arizona Court's electronic filing system and via e-mail and U.S. Mail to:


RM WARNER, PLC
8283 N. Hayden Road, Suite 229
Scottsdale, Arizona 85258
Daniel R. Warner, Esq. (AZ Bar# 026503)
Email: dan@rmwamerlaw.com
Raeesabbas Mohamed, Esq. (AZ Bar# 027418)
Email: Raees@rmwamerlaw.com
Tel: 480-331-9397
Fax: 1-866-961-4984
Attorneys for Plaintiff

/s/ Marc J. Randazza
Randazza Legal Group, PLLC

Marc J. Randazza (AZ Bar No. 027861)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
Telephone: 702-420-2001
ecf@randazza.com

Attorneys for Defendants
Audrey Davis and John Jacob Howe

## SUPERIOR COURT, STATE OF ARIZONA
## IN AND FOR THE COUNTY OF YAVAPAI

| | |
|---|---|
| **RHONDIE VOORHEES**, an individual, <br><br> Plaintiff, <br><br> v. <br><br> **AUDREY DAVIS**, an individual, and **JOHN JACOB HOWE**, an individual <br><br> Defendant. | Case No. P1300CV202100396 <br><br> Dept. 2 <br><br> **DECLARATION OF ALEX J. SHEPARD** |

I, Alex J. Shepard, declare:

1.      I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty.  I have first-hand knowledge of the facts set forth herein, and if called as a witness, could and would testify competently thereto.

2.      I am an attorney licensed to practice in the States of Nevada and California. I am an associate attorney with Randazza Legal Group, PLLC ("RLG"), counsel for Defendant Audrey Davis.

3.      I provide this declaration in support of Defendant Audrey Davis's  Motion to Dismiss.

4.      On October 7, 2021 at 3:48 p.m. Pacific time, while at the Las Vegas Office of RLG, and while using a MacBook Air laptop with the Google Chrome internet browser,

I visited the Billings Gazette website and navigated to the page displaying Keila Szpaller, "Transgender student drops out, alleges discrimination at Missoula College," BILLINGS GAZETTE (Aug. 9, 2015), at the url: https://billingsgazette.com/news/state-and-regional/montana/transgender-student-drops-out-alleges-discrimination-at-missoula-college/article_a57b17cd-4b32-5be1-8a61-3201439a137d.html. Immediately after viewing this page, I created a copy of the contents of this page using the Chrome browser's print to PDF function. A true and correct copy of this printout is attached to the Motion to Dismiss as **Exhibit A**.

5.      On October 7, 2021 at 3:49 p.m. Pacific time, while at the Las Vegas Office of RLG, and while using a MacBook Air laptop with the Google Chrome internet browser, I visited the Missoulian website and navigated to the page displaying Keila Szpaller, "University of Montana Dean of Students asked to leave," MISSOULIAN (Aug. 20, 2018), at the url: https://missoulian.com/news/local/university-of-montana-dean-of-students-asked-to-leave/article_cbcd2362-f723-5c73-9e8f-e88a6835d705.html. Immediately after viewing this page, I created a copy of the contents of this page using the Chrome browser's print to PDF function. A true and correct copy of this printout is attached to the Motion to Dismiss as **Exhibit B**.

6.      On October 7, 2021 at 1:05 p.m. Pacific time, while at the Las Vegas Office of RLG, and while using a MacBook Air laptop with the Google Chrome internet browser, I visited the "Meet the Dean of Students" page on the Embry-Riddle Aeronautical University, Prescott, Arizona website, at the url: https://prescott.erau.edu/campus-life/dean-of-students. Immediately after viewing this page, I created a copy of the contents of this page using the Chrome browser's print to PDF function. A true and correct copy of this printout is attached to the Motion to Dismiss as **Exhibit C**.

I declare under penalty of perjury under the law of the State of Arizona that the foregoing is true and correct.

Executed on October 7, 2021.

_____
Alex J. Shepard

Declaration of Alex J. Shepard
P1300CV202100396

# EXHIBIT A

Keila Szpaller, "Transgender student drops out, alleges
discrimination at Missoula College,"
BILLINGS GAZETTE (Aug. 9, 2015)

https://billingsgazette.com/news/state-and-regional/montana/transgender-student-drops-out-alleges-
discrimination-at-missoula-college/article_a57b17cd-4b32-5be1-8a61-3201439a137d.html

# Transgender student drops out, alleges discrimination at Missoula College

By KEILA SZPALLER For The Gazette

Aug 9, 2015



Jame, left, and Kim Wallack would like to see changes in student policies at Missoula College to protect transgender people from bullying and harassment. Jame left her studies at the college last spring, alleging discrimination at the campus.

10/7/21, 3:48 PM
Transgender student drops out, alleges discrimination at Missoula College | Montana State | billingsgazette.com

Case 3:21-cv-08249-DLR Document 24-11 Filed 01/11/22 Page 28 of 93

TOM BAUER/For The Gazette

By KEILA SZPALLER For The Gazette

# M

ISSOULA — Jame Wallack came out to her wife three days after they married in Drummond. She couldn't bring herself to do so earlier.

"I was afraid she'd leave me," Wallack said.

Jame, who lived her life as a man at the time, packed her belongings and put them in the family room. When Kim Wallack walked through the door, she was confused.

"Are we going on a trip?" Kim said.

"Not exactly," came the reply.

Then Jame told her a story.

"You know how I used to tell you that nobody could ever love me for who I truly am? Now, I'm going to tell you my secret," Jame said.

"She told me that since she was a little kid, 6 years old, 8 years old, she used to wish she could be just like her sisters. She wanted to play with dolls and not trucks," Kim said.

"I said, 'OK. What does this mean?' "

Said Jame: "I wish I could be a woman."

Jame worried that Kim wouldn't be able to handle the news, and the couple talked, and still talks, about their potential for longevity.

"There is a lot of hardship and trial and tribulation. And I knew there was a lot of stuff that I wasn't prepared for," Jame said.

She was right.

Speaking out

Last semester, Jame Wallack withdrew from Missoula College despite her own wishes.

The story Wallack tells isn't tidy, and a couple incidents in her recent past make her a flawed poster child for the cause she holds dear. She was admitted to the university conditionally because she has a felony conviction on her record; Wallack volunteered the information to the Missoulian.

Despite the unwieldy tale, Wallack's experience raises questions about whether every UM campus is as prepared for a diverse student body as it could be. It also shows the way a student on a difficult journey can get crosswise with an institution and feel blindsided by its policies.

In January 2014, Wallack enrolled in the paralegal studies program at Missoula College. She immersed herself in classwork, and began taking hormones.

"I was the first trans individual that most people had experienced," she said of her fellow students.

Later, the couple moved into town, and Kim enrolled in school, too.

Last fall, Jame Wallack grew more outspoken on transgender issues. Other students picked on her once in a while, she said.

"The more outspoken I became, the more enemies I obviously would make," she said.

A report released in June by the New York Civil Liberties Union said 75 percent of transgender students report being verbally abused at school; one in three is physically assaulted; and more than half avoid going to school because of harassment.

Wallack fell into the majority of students who are taunted. She heard insults in class, she said, and when teachers tried to stymie the snide remarks, she heard them in the parking lot and the halls.

"I've been called a tranny. I've been called a fag. I've been called every dirty word that a transgender person could be called," she said.

10/7/21, 3:48 PM
Case 3:21-cv-08249-DLR   Document 24-11   Filed 01/11/22   Page 30 of 93
Transgender student drops out, alleges discrimination at Missoula College | Local | billingsgazette.com

One day, someone called Kim a "fag lover" on campus.

"I've never cried so hard walking to my car," Kim said.

Showing bravery

Tom Stanton is director of the paralegal studies program, and he said Jame Wallack performed well in class and was engaged in discussions. She also had an obvious focus.

"She's very interested in working toward the rights of transgender people, and to that end, I believe her motives are relatively good, if not pure," Stanton said.

She confided that she had been harassed on campus, and he listened. Stanton never witnessed the bullying himself, but he took her stories as fact.

"I would tell you that every institution, not just in western Montana, but probably in the United States, could (benefit from an) equal rights review," he said.

He believes Wallack was brave to identify herself as a transgender person on campus, and he also figures her outspoken stance might have offended some.

"I think western Montana tends to be a pretty conservative place. Don't you?"

An incident

This past January, Jame Wallack grew depressed and anxious because of fluctuations in her hormones, and Kim decided her wife should go to the doctor and get medication.

"Boy, did that backfire in my face," Kim said.

Over spring break, Jame Wallack took painkillers for slipped discs in her back, and she took antidepressants.

One day in March, Kim asked if she had taken too many pills. Jame gave her a blank stare.

10/7/21, 3:48 PM
Case 3:21-cv-08249-DLR Document 24-11 Filed 01/11/22 Page 31 of 93
Transgender student drops out, alleges discrimination at Missoula College | Montana | billingsgazette.com

Then, she attacked her wife. A police report provided to the Missoulian by Jame Wallack said Jame grabbed Kim's throat and pinned her against the wall.

Kim told police that Jame let her go when she realized she was hurting her. Then, Jame panicked and put Kim in a head lock.

Kim escaped, Jame fled and Kim called police.

"(Kim) wanted the police to make sure Jame did not hurt herself," the report said.

After police promised Jame she would not go to jail, she arrived at the station. She received a misdemeanor citation for partner and family member assault; the charge is pending.

The couple said the attack was an anomaly, and both believe it was brought on by Jame's prescriptions.

Jame does not remember those 48 hours. A doctor's letter confirms the drug Jame took can cause blackouts and aggression, and the physician said he discontinued the prescription.

"I think it is quite likely that Jame unintentionally took an overdose of her medication in an effort to manage symptoms of a severe anxiety attack, and this could certainly explain any mood changes, anger or violence that occurred," the doctor said in the letter.

Policy needed

Earlier the same month, another student at UM was violently attacked with a tire iron at student housing. The attacker struck the victim's face, broke his jaw, severed his ear, and left him bloodied and battered.

The Wallacks said the suspect in that case was their neighbor, also a transgender person.

The repercussions were immediate and severe.

Said Kim: "School became hell for Jame."

"They thought if one transgender person was willing to do that, we all were. I'm not the only trans person who lived in fear on campus," Wallack said.

In response, Jame took action.

She was already speaking on transgender issues in classes. Now, she talked with the interim dean about starting a Diversity Day for the Missoula College campuses; she began combing through school policies and the conduct code.

"I tore it apart," Wallack said. "There's got to be a violation here. I'm getting bullied in school for this reason."

The University of Montana prohibits harassment, including name calling based on gender identity, in its discrimination policy; it prohibits harassment in general in the conduct code.

Wallack, however, did not see a policy in the conduct code that explicitly addressed bullying or the type of aggression she had experienced.

She believes one should be in place, given the high rates of assaults transgender students experience on campuses and their high suicide rate. Forty-one percent of transgender people nationally will attempt suicide, according to the New York Civil Liberties Union.

"If we're not going to allow bullying in our high schools and middle schools, then why would you allow it on the college campuses?" Wallack said.

She collected some 50 signatures for a petition to advocate for amending the conduct code, and she made plans to run for the student senate.

Suspension

Then, Wallack's plans unraveled.

On April 14, she received an email from Dean of Students Rhondie Voorhees asking for a meeting. Two days later, Voorhees handed her a letter that stated Wallack was being placed on interim suspension.

The letter, which Wallack provided to the Missoulian, stated she had violated the conduct code. The letter named three specific incidents, which Wallack disputes.

It notes Residence Life responded to numerous noise disturbances at Wallack's home. Wallack said she never received notice from Residence Life.

It notes a citation for alcohol use. Wallack said police responded to a noise complaint at her home last December because she and Kim had gotten into a loud argument. She said she never received a citation, and she relayed the outcome to Voorhees. "I said, 'They didn't cite me for anything.' (Voorhees) said, 'No. But they should have,' " Wallack recalled. UM Police Chief Marty Ludemann confirmed police did not cite Wallack.

The letter notes the event in March that led to her pending misdemeanor citation; she offered her doctor's note in response.

At the meeting, the dean told Jame that if she did not initiate the conduct code process to clear the violation, the dean would move for her expulsion, Wallack said.

Voorhees also told her she could drop out to avoid being expelled, Wallack said.

Wallack did not want to address the violation at UM, at least until she had taken care of the misdemeanor citation in the courts.

On April 20, she withdrew from Missoula College.

"I felt pushed into that situation, where I really had no choice," Wallack said.

Difficult transition

Jame's hardships aren't over.

She is working, but finding a job that will allow her to support her family has been difficult. In her day job, she presented herself as a man up until a couple weeks ago because she had trouble getting work in the midst of her transition.

She wasn't allowed at university housing, so she lived out of her car for a period because it was hard to come up with first and last month's rent.

Kim was evicted from UM housing because she fell behind with rent, and the couple finally found a place to live off campus, together.

Jame said it is small, but it will do for the time being.

Some day, Jame would like to finish her degree in paralegal studies and enroll at a university.

Blindsided

Wallack feels blindsided by the university.

Up until the meeting, she believed she had put her life on the right track. She found the source of personal problems that led to lapses in judgment, she started to transition, and she applied herself at school.

"I felt I owed it to myself, to the community, to try to give something back, to try to make a difference," Wallack said. "My first opportunity to do that was pulled out from underneath me."

No one warned her she was on the brink, she said.

In an email to the Missoulian, Dean Voorhees said UM is not obligated to give warnings to students admitted conditionally. She could not speak to this specific case, but she shared UM's general standards.

"If students are given conditional admission to the university because they have past criminal convictions, we do not need to give warning or notice before taking action on any new violation of the Student Conduct Code, local, state or federal laws, or

conditions of their probation, no matter how minor," Voorhees said.

"These conditions and expectations are made very clear at the time of admission; failure to adhere to any conditions of admission means they may be suspended or expelled.

"We can move quickly and without warning, especially if new behaviors are so serious or disruptive that we are concerned about the safety and well-being of others in the campus community."

In a letter to Wallack, Voorhees noted UM may impose interim action "effective immediately."

The letter, which Wallack provided to the Missoulian, notes UM was concerned about the threat she posed to other occupants of the apartment.

"The police report indicates that you had attempted to strangle another student in the apartment," the letter said.

Wallack believes she has adequate evidence, including the letter from her doctor and statements from her wife, to show the incident in March was an isolated episode linked to the medication she was taking to help her through her transition.

She does not have a violent past, she said; she said her prior conviction was for burglary, bail jumping and criminal endangerment.

'Not what you think'

Last spring, UM officials pulled Kim aside and told her that she should not be with Jame Wallack, Kim said.

Kim, though, is sticking by her wife.

"This is not what you think it is," Kim has told them.

Case 3:21-cv-08249-DLR  Document 24-11  Filed 01/11/22  Page 36 of 93

Jame had demons in the past, and her decision to transition has quieted them, according to both Wallacks.

The police report notes Kim would not have been surprised if Jame had tried to strangle her in the past, as a man.

"The person she used to be in a heartbeat, I would tell you, yeah, he tried to strangle me. He would have killed me," the report said in a summary of Kim's remarks.

"Her, she is not like that. Blows my mind as much as it blows anybody else's."

Kim confirmed the sentiment in an interview. She said Jame had never raised a hand to her, but she had witnessed the anger in her partner.

"The minute she started transitioning, everything was way different," Kim said.

Not alone

Jame knows some of her transgender peers on campus have a different experience than hers, but she also knows she isn't alone in being bullied at Missoula College.

She would like UM to put as much effort into diversity at the college as it does on the main campus.

"The west campus gets swept under the rug," Wallack said.

She told more than one school official about the bullying, but she said no one encouraged her to file a written complaint. She said the harassment included people repeatedly addressing her as a man.

UM's discrimination policy calls for employees to report sexual harassment within 24 hours to the Equal Opportunity Office.

Legal counsel Lucy France said she did not believe an employee would be disciplined for failing to report a student's complaint about being referred to by the wrong gender, but she said such behavior could constitute discrimination.

10/7/21, 3:48 PM                    Transgender student drops out of college, alleges discrimination at Missoula College | Montana State | billingsgazette.com

Case 3:21-cv-08249-DLR  Document 24-11  Filed 01/11/22  Page 37 of 93

"It is something that more education could help people understand," France said.

On the other hand, the seed Wallack planted about holding a Diversity Day at the east and west college campuses appears to have taken root.

Penny Jakes, who was interim dean of the college in the spring, confirmed she and Wallack talked about such an event. They disagree on how far the effort went, but Jakes said Missoula College now plans to coordinate with UM on a Diversity Day.

Via

**missoulian.com**

# <u>EXHIBIT B</u>

Keila Szpaller, "University of Montana
Dean of Students asked to leave,"
MISSOULIAN (Aug. 20, 2018)

10/7/21, 3:49 PM
University of Montana Dean of Students asked to leave | Local News | missoulian.com
Case 3:21-cv-08249-DLR Document 24-11 Filed 01/11/22 Page 39 of 93

https://missoulian.com/news/local/university-of-montana-dean-of-students-asked-to-leave/article_cbcd2362-f723-5c73-9e8f-e88a6835d705.html

Dean of Students

# University of Montana Dean of Students asked to leave

Keila Szpaller
Aug 20, 2018

University of Montana Dean of Students Rhondie Voorhees was asked to leave her office last Tuesday, sources said this week.

When reached Monday, the dean did not answer questions about her departure.

"I will decline to comment other than to say I am employee in good standing at the University of Montana," Voorhees said.

At UM since July 2012, her departure comes on the cusp of a new school year and represents another guard change among top UM administrators in the last six months. The change also comes as UM's leaders stress a focus on student success in order to improve their retention and follows a reorganization of campus divisions.

Monday, Faculty Senate Chair Matt Semanoff said he did not know Voorhees was no longer working at UM, but he believes the restructure might call for a different position.

"I imagine that with the university's interest in redefining the provost's office to encompass some of the sectors that have traditionally been associated with student affairs and establishing a more holistic approach to academic affairs, it is likely that the dean of students position will be changing in the future," Semanoff said in an email.

In January, Seth Bodnar stepped into the role of UM president. He subsequently announced a restructure that combined enrollment and communications responsibilities under one vice president and placed supervision of both academic and

student affairs with the provost.

Provost Jon Harbor started Aug. 1 and stepped into a position that had been filled by an interim executive.

Monday, officials in Main Hall did not respond to emails and a voicemail for comment.

UM spokeswoman Paula Short said in a text she was in Butte for an alumni event and would answer questions Tuesday. At press time, Human Resources director Terri Phillips had not provided Voorhees' contract or compensation.

Campus administrators generally work on one-year contracts that run through June 30 when the fiscal year ends, but it was not clear Monday if Voorhees would be paid through June 30, 2019.

\*\*\*

**Last school year**, student Lisa Davey worked with Voorhees after UM announced it was bringing back Bobby Hauck as the Grizzlies football coach. Hauck's rehire was controversial; supporters touted his wins, but detractors blamed him for creating an environment that led to a sexual assault scandal at UM after he left.

Davey launched a petition against his rehire and experienced blowback. Monday, she said Voorhees was her liaison to the administration in that time, and she was impressed with the way the dean handled her situation.

Davey said she did not know the dean was no longer at UM, but she said Voorhees made her feel safe on campus when she was threatened as a student.

"She was incredibly professional and kind," said Davey, who is writing her master's thesis. "She was really paying attention to what was happening with the threats.

"She had employees working on tracking them down and following them and keeping track of Twitter to make sure everyone on campus was safe and that I was safe."

Voorhees holds a doctorate in philosophy from the University of Maryland, College Park, according to her LinkedIn profile.

Associated Students of the University of Montana President Alex Butler was out of the office Monday and unavailable for comment. However, Mariah Welch, vice president, said Voorhees served as a mentor and helped her with a couple of initiatives and student conduct code questions when the vice president served as a student senator.

"We work pretty closely with all of the deans and all of the vice presidents," Welch said. "And I know we worked really well with all of them in the past, and we worked well with Tom Crady as well."

In summer 2016 under a different president, Crady took the job as UM's first vice president for enrollment and previously oversaw the dean of students. Bodnar took the helm this January, and he did not renew Crady's contract. He also announced the restructure that combined enrollment and communications under one vice president.

The departure of Voorhees leaves one fewer woman serving as permanent dean at the campus. Although women are serving in interim posts, the only other female dean serving in a permanent capacity is Dean of Libraries Shali Zhang. Monday, UM did not address whether it would appoint an interim dean of students.

In the 2014-15 school year, ASUM named Voorhees administrator of the year. A UM news release in 2016 noted the dean was among the Diversity Advisory Council members who designed Diversity ForUMs to "improve communication, education and relations among people of diverse backgrounds."

\*\*\*

**Voorhees' departure** also comes as the Montana Office of the Commissioner of Higher Education again appeals a lawsuit author Jon Krakauer filed against the state.

Krakauer wrote a book about campus rape focused on Missoula. In it, he discusses the 2012 expulsion of former UM Grizzlies quarterback Jordan Johnson and its subsequent reversal.

Case 3:21-cv-08249-DLR   Document 24-11   Filed 01/11/22   Page 42 of 93

In March 2013, Johnson was acquitted of sexual intercourse without consent by a jury in Missoula County District Court.

On campus, Voorhees rejected an independent consultant's determination that Johnson was guilty of a 2012 rape allegation, according to Krakauer's book, "Missoula: Rape and the Justice System in a College Town." The book said the previous dean of students reached the same conclusion as the consultant.

In April 2011, however, the U.S. Department of Education and its Office of Civil Rights told universities to use a lower standard of proof to evaluate cases of sexual violence. UM legal counsel earlier said UM was transitioning to the new standard in 2012 and only published its new policy in August 2013.

In the transition, some UM officials reviewed cases under the new standard, after the announcement of the change, but before it was officially published in policy, according to UM.

Krakauer has sued the state and Commissioner Clayton Christian over records related to the decision, arguing the public has the right to know how higher education officials make decisions about star athletes. The Commissioner's Office has argued in favor of student privacy.

This summer, the Commissioner's Office again appealed a district court's decision to the Montana Supreme Court after the state high court remanded the case for a private review of records. The district court found some records could be released with redaction.

Monday, spokesman Kevin McRae confirmed the Commissioner's Office is pursuing its appeal of the ruling. McRae also said the Commissioner's Office did not play a part in the departure of Voorhees.

Case 3:21-cv-08249-DLR   Document 24-11   Filed 01/11/22   Page 43 of 93



Rhondie Voorhees

Provided by Facebook

Keila Szpaller
City editor

# **EXHIBIT C**

"Meet the Dean of Students" page on ERAU website

# Meet the Dean of Students



## Mission Statement

The mission of the Dean of Students Office is to support Embry-Riddle Aeronautical University and the Division of Student Affairs by providing services, resources and advocacy for all of our students to promote an ethical community through fundamental fairness, mutual respect, personal accountability and responsible citizenship. Through our collaborative efforts, we strive to create a safe and welcoming campus environment that embraces a diversity of ideas, beliefs and cultures, where ideas can be freely exchanged in an environment guided by fairness, honesty and integrity.

## Letter from Dean Rhondie...

From the time our students arrive on the Prescott Campus for their orientation and first class until the last final exam is completed prior to graduation, the ERAU Prescott Dean of Students Office **interacts with students** in ways that contribute to an exceptional and comprehensive student experience.

Our students are exposed to what can only be described as unlimited opportunities for involvement, leadership, and personal exploration. The Dean of Students Office, and the departments that fall under it, help students take an active role in positively shaping our campus community and their futures.

We are involved, interested, and invested in the education and development of our students. We support our students and assist them in fulfilling our University Vision Statement: "Embry-Riddle will be the world's source for innovation and excellence in aerospace education and applied research, global security and intelligence, aviation business administration, meteorology and more."

I encourage all students to explore this website. Even more, I encourage students to visit the Dean of Students Office and get to know me and my staff members who are dedicated to their social, ethical, spiritual, and leadership development. Go Eagles!

*Rhondie Voorhees*
*Dean of Students*



**Dean of Students Dean of Students Office Services and Assistance**

> **Concerned about a Student?**

> **Student Records & Auxiliary Access (FERPA)**

> **Student Behavioral Concerns**

> **Grievance Procedures**

> **Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination, and Sexual Misconduct**

> **Personal/Medical Issues and Concerns**

> **Student and Recognized Organization Conduct**

> **Student Handbook**

**Functions Supported by the Dean of Students Office**

### Graduation

### OctoberWest

### Parent & Family Association

### Student Government Association

## Contact Us

**Dean of Students Office**
📞 928-777-3879
✉ prdos@erau.edu



## Related Resources

**Student Handbook** ›

**Campus Safety & Security** ›

**Campus Counseling** ›

**Health & Wellness** ›

**Alcohol & Drug Assistance** ›

**Introducing Prescott's New Dean of Students, Dr. Rhondie Voorhees**

Coming from the University of Montana where she served as Dean of Students since 2012, Dr. Voorhees brings over thirty years of experience in higher education to Embry-Riddle, including a Ph.D. in higher education and student affairs. We caught up with Dean Voorhees to learn more about her background, what brought her to Embry-Riddle, and what motivates her to do what she does.

# **EXHIBIT D**

First Amended Complaint in *Cole v. Montana University System*, Case No. CV-21-88-M-BMM (D. Mont.)

Hillary P. Carls
Sherine D. Blackford
BLACKFORD CARLS P.C.
602 W. Lamme Street
Bozeman, MT 59715
406.577.2145
406.219.0256 (fax)
carls@blackfordcarls.com
sherine@blackfordcarls.com
*Attorneys for Plaintiffs & Putative Class*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| Catherine Cole, Barbara Koostra, Mary-Ann Sontag Bowman, and Rhondie Voorhees, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Montana University System, University of Montana-Missoula, and John Doe Defendants 1-50,<br><br>Defendants. | CV-21-88-M-BMM<br><br>**First Amended Complaint, Request for Class Certification, & Jury Trial Demand** |

Plaintiffs, Catherine Cole, Barbara Koostra, Mary-Ann Sontag Bowman, and

Rhondie Voorhees, individually and on behalf of all others similarly situated, by

and through their counsel of record, Hillary P. Carls and Sherine D. Blackford of

Blackford Carls P.C., pursuant to Federal Rule of Civil Procedure 15(a)(1)(A), file

their First Amended Complaint, Request for Class Certification, & Jury Trial

1

Demand, requests that this action be certified as a class action under Federal Rule of Civil Procedure 23, and complains and alleges as follows.

## Introduction

1.      In response to pervasive discrimination against women, in 1972, the United States took a monumental step forward to achieving gender equality in our educational institutions with President Nixon signing Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX"). This visionary law provides:

> No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance … .

20 U.S.C. § 1681 (emphasis added).

2.      University of Montana-Missoula ("UM") has long fostered and encouraged a culture, and the resulting actions, that "on the basis of sex" denied female employees the benefits of their long dedication to UM's educational programs. UM did not create a glass ceiling for these women's careers. UM created a brick wall for these women's careers.

## Parties

3.      At all times relevant hereto, Plaintiff Catherine Cole was a resident of Missoula, Montana and employed by UM.  Ms. Cole now lives in the United Kingdom.

2

4.      At all times relevant hereto, Plaintiff Barbara Koostra was a resident of

Missoula, Montana and employed by UM. Ms. Koostra currently lives in Missoula.

5.      At all times relevant hereto, Plaintiff Mary-Ann Sontag Bowman was a

resident of Stevensville, Montana and is employed by UM. Dr. Sontag Bowman

currently lives in Stevensville.

6.      At all times relevant hereto, Plaintiff Rhondie Voorhees was a resident of

Missoula, Montana and employed by UM.  Dr. Voorhees currently lives in

Arizona.

7.      At all times relevant hereto, Defendant MUS is a Montana governmental

agency, which operates the State of Montana's public post-secondary educational

institutions through the universities and community colleges. The Board of

Regents of Higher Education and the Commissioner of Higher Education

"supervise, coordinate, manage and control" MUS, as outlined in Article X,

Section 9 of the Montana Constitution, which explains:

> (2) (a) The government and control of the Montana university system
> is vested in a board of regents of higher education which shall have
> full power, responsibility, and authority to supervise, coordinate,
> manage and control the Montana university system and shall
> supervise and coordinate other public educational institutions assigned
> by law. …
> (c) The board shall appoint a commissioner of higher education and
> prescribe his term and duties.

8.      At all times relevant hereto, Defendant UM is a public higher education

institution, which operates in Missoula, Montana.  Defendant UM is the flagship

3

campus of the University of Montana campuses.  UM maintains undergraduate,

graduate, and professional courses of studies, and employs thousands of persons.

9.      MUS manages and supervises UM as one of the universities under MUS's

authority.

10.     Defendants MUS and UM receive federal funds within the meaning of Title

IX, 20 U.S.C. § 1681, *et seq*.

11.     Plaintiffs believe that the John Doe Defendants are subject to the jurisdiction

of the State of Montana and this Court.  John Doe Defendants are parties that may

have been involved in the occurrences set out herein, may have been agents of,

employers of, employees of, franchisers or franchisees of, or contractually

obligated to the named Defendants or are in privy with the named Defendants and,

therefore, said John Doe Defendants may have committed one or more of the acts

set out herein or may be responsible through tortuous interference, strict liability,

breach of warranty, negligence, negligent misrepresentation, the law of agency,

respondeat superior, franchise law or by contract for the acts of the named

Defendants as set out herein.  Plaintiffs believe and therefore allege that the John

Doe Defendants may have committed one or more of the acts set out herein and

that they would therefore be liable for the same.  Plaintiffs will amend these

pleadings as the case progresses to specify the various acts of the John Doe

Defendants.

4

## Venue & Jurisdiction

12.     The events that are the basis of Plaintiffs' claims occurred in Missoula, Montana.

13.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1343.

14.     Plaintiffs bring this action to redress a discriminatory and hostile educational environment pursuant to Title IX, and Montana state law claims, as more fully alleged herein.

15.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' state law claims because they "form part of the same case or controversy…."

16.     The amount in controversy exceeds the minimum jurisdictional limits of this Court exclusive of interest and costs.

17.     Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2) and Local Rule of Procedure 3.2.

## Facts

18.     Title IX governs the Defendants' culture, actions, and policies related to gender because they receive federal funding.

19.     At all times relevant hereto, UM had adopted policies and procedures to implement requirements of Title IX.  *See, e.g.,* Discrimination, Harassment, and Retaliation Policy, Policy Number 737, Implementation Date August 14, 2020,

Responsible Office Equal Opportunity and Title IX (available at

https://www.umt.edu/eo/_docs/policy.pdf); Discrimination Grievance Procedures

Accompanying the Discrimination, Harassment, and Retaliation Policy, University

of Montana, Office of Equal Opportunity & Title IX (available at

https://www.umt.edu/eo/_docs/discrimination-procedures.pdf).

20.     MUS further directed the Office of the Commissioner of Higher Education

("OCHE") to comply with "state and federal guidelines" regarding non-

discrimination practices. *See* Montana Board of Regents of Higher Education,

Policy and Procedures Manual, Policy 703 – Non-discrimination, Montana

University System (Effective: June 7, 1976; Revised: July 15, 2013) (available at

https://www.mus.edu/borpol/bor700/703.pdf).

21.     UM historically has been the flagship institution of the Montana University

System, and for many years UM had the highest enrollment among the universities

in the State.  UM maintained a favorable reputation for its Business, Fine Arts, and

Sciences programs, and other professional programs, including the School of

Pharmacy and School of Law.

22.     UM athletics, particularly the men's football program, was a long-standing

source of pride for students, alumni, and Montanans.  UM athletics fostered not

only a source of income for UM, but attracted many persons to UM, including

students, employees, alumni, and community members.

23.     While these were some of the positive qualities of UM, it also fostered a

"good ol' boys club" culture, favoring male athletes and employees, while

excluding women from participation in activities and benefits regularly afforded to

their male counterparts.

24.     In September 2010, MUS appointed Royce Engstrom as UM President.

25.     Late 2011 started a dark and difficult period for UM, with the well-known

sexual assault scandals and resulting U.S. Department of Justice's and Department

of Education's investigations into UM for its handling of sexual assaults on

campus and violating Title IX.

26.     Ultimately, these investigations determined that UM:

     a.     violated Title IX, and

     b.      "did not take sufficient effective action to fully eliminate a sexually

     hostile environment, prevent its recurrence, and address its effects."

Letter from U.S. Department of Justice, Civil Rights Division and U.S. Department

of Education, Office for Civil Rights to The University of Montana at 7 (May 9,

2013).

27.     The scandals also led to Jon Krakauer publishing his best-selling book:

"Missoula: Rape and the Justice System in a College Town."

28.     The sexual assault scandals generated fierce public sentiment.  Since 2011,

UM's enrollment suffered historic declines, while Montana State University-

7

Bozeman's enrollment has grown, exceeding UM's total enrollment by nearly double.

29.     After this difficult period, President Engstrom's tenure at UM ended on December 31, 2016.  UM began its search for a new president to lead it out of this arduous time of decline, hoping to regain UM's former glory.

30.     In 2017, MUS appointed Seth Bodnar as President of UM.  President Bodnar was the non-conventional candidate without a doctoral degree or employment in higher education administration.  Instead, he had corporate and military experience, working as a former senior executive at the General Electric Company ("GE") following his graduation from West Point and his decorated military career.

31.     Like UM, GE suffered from a precipitous decline, a federal administrative investigation, and performance shortfalls.  GE also had its own pervasive issue with gender discrimination, fostering patterns and actions that favored and promoted male employees to the detriment of women. *See, e.g., Schaefer v. General Elec. Co.,* 2008 WL 649189 (D. Conn. 2008) (settled outside of court for a confidential amount).

32.     President Bodnar's other prior experience was with the military, an institution long plagued with gender discrimination.

33.     As UM suffered the consequences of its unequal treatment of women, President Bodnar took the reins.  Yet, President Bodnar's prior experience was exclusively with institutions who had their own troubled past with gender discrimination.

34.     For professional women at UM, their already limited paths to professional success soon narrowed.

35.     Under President Bodnar's leadership and in violation of UM's policies and federal law, youth, perceived attractiveness, and/or fitness were relevant factors for women navigating a successful path. It was well known that under President Bodnar, the careers of the athletic-built women thrived, while older, less attractive women were publicly critiqued.

36.     Under President Bodnar's leadership and in violation of UM's policies and federal law, a retaliatory culture blossomed, creating significant risk of punishment for female professionals expressing challenging or dissenting statements.

37.     Under President Bodnar's leadership and in violation of UM's policies and federal law, UM intimidated women, threatening their careers as the consequence to asking hard questions or making hard statements.

38.     Under President Bodnar's leadership and in violation of UM's policies and federal law, women's choices and actions were unreasonably contradicted and questioned.

9

39.     Under President Bodnar's leadership and in violation of UM's policies and federal law, while men at UM had the opportunity to lead, contribute, and have long careers at UM, women did not.

40.     Ignoring the need to reevaluate its actions and the resulting treatment of women, UM's discriminatory culture persisted, creating a career-brick-wall for experienced, confident women.

41.     MUS furthered and implicitly encouraged UM's discriminatory culture and behavior, with MUS's own failure to comply with its policies and federal law, terminating experienced, competent, and qualified women who challenged the "good ol' boys club."

42.     Upon information and belief, this discriminatory and retaliatory behavior continues today because female employees continue to fear retaliation and loss of their economic security by speaking out in this lawsuit.

43.     Defendants have acted with deliberate indifference towards UM's treatment of women, which includes failing to timely act to stop behaviors that violate UM's own policies and federal law.

44.     Plaintiffs' experiences discussed below are only a few examples of this pervasive culture of a male domination and retaliation against experienced (often older) female professionals.

45.     Effectively, if a female employee acted as a whistleblower, UM retaliated against her. A culture of punishment persists.

## Catherine Cole

46.     In July 2018, UM hired Ms. Cole as its Vice President of Enrollment Management and Strategic Communication.

47.     Ms. Cole came from the University of North Florida where she served as Assistant Vice President of Enrollment Services and Director of Integrated Marketing and Strategic Communication.  She had more than 25-years of experience in higher education, and successfully increased brand awareness, diversity, and enrollment for the institutions she worked for. *See* Curriculum Vitae Catherine Cole (Exhibit 1) (discussing Ms. Cole's education and experience; contact information redacted). When she left the University of North Florida, she had increased enrollment by 44%.  Today, the University of North Florida continues to benefit from Ms. Cole's strategic vision and implementation of infrastructure with enrollment, retention, and graduation rates increasing above 75%.

48.     When Ms. Cole was hired, she was 50-years-old. Ms. Cole was not an obviously athletic woman.

49.     Upon information and belief, President Bodnar did not want to hire Ms. Cole, but the hiring committee uniformly selected Ms. Cole as the best candidate.

11

50.     At the time, Ms. Cole was the only female Vice President at UM.

51.     During her employment, Ms. Cole earned a starting salary of $170,000 annually.  UM paid Ms. Cole the lowest salary of its Vice Presidents, despite her exceptional qualifications, work ethic, and results.

52.     At the time UM hired Ms. Cole, UM had recently created the Vice President of Enrollment Management and Strategic Communication position for the President's cabinet, integrating marketing, communications, and enrollment into one position.

53.     As a senior executive on the President's cabinet, Ms. Cole's leadership responsibilities included marketing, communications, public relations, UM branding, recruiting students, faculty and staff, and engaging UM alumni, community members, and businesses.

54.     During her employment with UM, Ms. Cole received countless praise and accolades for her work performance.  Ms. Cole's work was improving the perception of UM and its enrollment.

55.     Despite Ms. Cole's excellent work, President Bodnar:

    a.      micromanaged her,

    b.      continually altered and changed her goals and job duties,

    c.      set unreasonable expectations,

    d.      informed her that she was moody,

e.    asked her to smile,

f.    criticized how she communicated and the tone of her voice,

g.    belittled her, and

h.    commented about her appearance, including her weight, noting that

she could not be the face of UM.

56.    Despite being a Vice President of UM, Ms. Cole was excluded from

meetings with the Board of Regents.

57.    Ms. Cole became the only UM cabinet member who was second guessed,

interrupted, criticized, and questioned.

58.    This unprofessional toxicity and discrimination forced Ms. Cole to resign on

July 24, 2020.

59.    The working conditions at UM were so difficult for Ms. Cole that she was

compelled to, and had no other choice but to, resign.

60.    At all times prior to Ms. Cole's resignation, she was an employee in good-

standing. She was never the subject of a disciplinary action.  President Bodnar, her

supervisor, never poorly reviewed Ms. Cole.

61.    After Ms. Cole's forced resignation, Defendants hired two people to replace

Ms. Cole.

62.    Defendants' actions forced Ms. Cole's career path downward.  To escape

UM's discriminatory and toxic environment, Ms. Cole took a $40,000 pay cut and

moved away from her family to a smaller university.  Ultimately, Ms. Cole

continued to suffer from UM's discriminatory actions, and in 2021, she retired

early, leaving higher education in total.

63.    Defendants further retaliated against Ms. Cole by eventually terminating her

husband's position at UM, explaining that the funding for his position had ended.

Despite this alleged funding issue, Defendants paid Ms. Cole's husband his salary

for the 5-months remaining on his contract after his termination. Upon information

and belief, Defendants are currently seeking to rehire his position.

64.    As a result of Defendants' mistreatment and discrimination, Ms. Cole has

suffered from weight fluctuation, migraines, depression, anxiety, chest pain,

vomiting, and increased kidney disease from the stress and dehydration.

65.    As a result of Defendants' actions, Ms. Cole has been damaged.

### Barbara Koostra

66.    In January 2005, UM hired Barbara Koostra to be Director of the Montana

Museum of Art and Culture ("Museum").

67.    Ms. Koostra earned a B.M. at Northwestern University and an M.B.A. at

UM. At the time she was hired, Ms. Koostra was previously the Executive Director

for the Missoula Cultural Council, Communications Director for the Montana Arts

Council, and Communications Specialist at the National Endowment for the Arts

in Washington D.C. *See* Curriculum Vitae Barbara Koostra, M.B.A. (Exhibit 2)

(discussing Ms. Koostra's education and experience; contact information redacted).

68.    During her 14-year tenure at the Museum, Ms. Koostra expanded the Museum's permanent collection, doubling the value to approximately $25 million–$30 million, making it one of the most valuable and significant art collections in Montana.

69.    Ms. Koostra received more attention for the Museum and produced more programming than any previous Director in her position. Under Ms. Koostra's direction, the Museum presented over 60 exhibits, including Monet, Renoir, Rembrandt, Chagall, Picasso, Corot, Diebenkorn, Pulitzer Prize photographers, and other well-known and historic artists.

70.    She increased the financial viability of the Museum, raising over $1.5 million in operating, building and project funds.

71.    Ms. Koostra's fundraising efforts and donor relationships allowed her to maintain her salary, despite budget cuts by UM from 2007 to 2009, which eliminated much of the Museum's staffing.

72.    In 2018, President Bodnar and Interim Provost Paul Kirgis of UM asked Ms. Koostra to decorate the downtown Missoula Marriott with the Museum's permanent collection. Ms. Koostra directly questioned the appropriateness of this request because the public owns the artwork and the Marriott's facilities did not

15

appear to have the security and climate control requirements necessary to protect the collection.

73.     In raising her concerns, President Bodnar and Interim Provost Kirgis accused Ms. Koostra of refusing to cooperate.

74.     Traditionally, Museum art is displayed at the UM President's house and office. Chelsea Bodnar, President Bodnar's wife, directed the President's staff to inappropriately handle and move art in those locations, ignoring the concerns of the Museum staff. This diminished and devalued Ms. Koostra's professional role as the Museum's Director.

75.     In September 2018, UM moved Ms. Koostra's office to McGill Hall, Room 212.

76.     She immediately noticed the stuffy, hot, fumy, odorous and dank conditions in her office.  Concerned with these work conditions, Ms. Koostra notified the "work-order desk" multiple times about the air quality problems. For weeks, despite attempting remedies, UM found no solution. Ultimately, UM vacated McGill Hall due to the extent of the asbestos problem, which it first discovered in Ms. Koostra's office.

77.     On November 13, 2018, Ms. Koostra emailed Dean Stephen Kalm about the poor work conditions in McGill Hall.  Approximately 2-hours later, the Provost's office contacted Ms. Koostra seeking to schedule a meeting.

78.     Six-days later, on November 19, 2018, the Provost notified Ms. Koostra that her contract would not be renewed because of budgetary constraints and reorganization.

79.     At the time of Ms. Koostra's termination she was 62-years-old and nearing the end of her career.  She had successfully served as the Museum's Director for 14.5-years.  Had Ms. Koostra reached 15-years, she would have been eligible for the Defendants' retirement benefits.

80.     During Ms. Koostra's employment with UM, she was an employee in good-standing.

81.     Despite the alleged budgetary concerns, UM ceased Ms. Koostra's work beginning January 1, 2019, but paid her another 6-months through the term of her contract.  UM paid her for 6-months during which UM prohibited her from working.

82.     Ultimately, Ms. Koostra's complaints about the poor working conditions in McGill Hall had merit because UM discovered asbestos in the building.  This was an especially important discovery given that McGill Hall housed UM's preschool.

83.     Despite its claim of reorganization, Defendants replaced Ms. Koostra with a male Museum Director with fewer qualifications and a higher starting salary than Ms. Koostra received when she began in this position.

17

84.     As a result of Defendants' actions, Ms. Koostra has received medical treatments and therapies.

85.     As a result of Defendants' actions, Ms. Koostra's successful career was cut short.

86.     As a result of Defendants' actions, Ms. Koostra fears for her health due to her asbestos exposure.

87.     As a result of Defendants' actions, Ms. Koostra has been damaged.

### **Mary-Ann Sontag Bowman**

88.     Dr. Sontag Bowman is a tenured associate professor in UM's School of Social Work.

89.     Dr. Sontag Bowman holds a Ph.D., M.S.W. and B.A. in Social Work from the University of California Berkley.  She is also a Licensed Clinical Social Worker.  *See* Curriculum Vitae Mary-Ann Sontag Bowman, Ph.D., LCSW (Exhibit 3) (discussing Dr. Sontag Bowman's education and experience; contact information redacted).

90.     Dr. Sontag Bowman has been employed by UM since 2008, and is an employee in good-standing. Dr. Sontag Bowman has never been the subject of a disciplinary action nor received a poor review from her supervisors.

91.     She is currently 62-years-old.

18

92.     The School of Social Work, like the profession of social work, is dominated by women.

93.     The School of Social Work has more female than male students.

94.     Despite the School of Social Work primarily being filled with women, its leadership roles have long been held by men.  Like other programs at UM, UM's "good 'ol boys' club" mentality permeates into the School of Social Work.

95.     In 2020, at the encouragement of UM leadership, the only male faculty member and current chair sought a second 5-year term; effectively, foreclosing female leadership in the School of Social Work for a decade.

96.     In response, Dr. Sontag Bowman aptly observed:

> UM has a gender issue in leadership positions, and this email establishes a plan to have that continue in the School of Social Work. The optics and implications of a female faculty being led by a man – and years and years of male leadership in a female-dominated department and profession – are unfortunate.
>
> I find all that disheartening and disappointing – women need not apply is the bottom line.

97.     Had UM not discouraged other applicants by selecting its preferred choice, Dr. Sontag Bowman would have applied for this leadership position.

98.     After a successful 13-year career, and asset for the School of Social Work, Dr. Sontag Bowman has hit a career-brick-wall. Despite her qualifications, UM discouraged her opportunities for professional growth and leadership, while favoring her male counterparts.

99.    As a tenured professor, Dr. Sontag Bowman has repeatedly raised concerns over UM's poor male leadership and discriminatory treatment of women.

100.   When she served as Chair of the Faculty Senate, Dr. Sontag Bowman, among other actions:

a.    brought to light President Bodnar's resume inaccuracies shortly after the Defendants hired him, and

b.    challenged, with other faculty leaders, President Bodnar's plan to promote a male to an administrative position without searching for other candidates nor considering a diversity plan.

101.   Dr. Sontag Bowman has served as a whistleblower, bravely alerting UM to issues regarding its unequal gendered actions—including the ongoing male leadership in the School of Social Work, and President Bodnar's resume misrepresentations and failure to consider or address gender equity.

102.   Dr. Sontag Bowman has acted under the persistent fear of retaliation.  She is well-aware of UM's longstanding record of terminating female employees for speaking out, using excuses like budgetary cuts or reorganization to oust them.

103.   Dr. Sontag Bowman fears that she will be forever prohibited from achieving leadership positions or other opportunities for professional growth due to UM's pervasive favoritism of men.

104.   At times, Dr. Sontag Bowman has been accused of being a bully by male UM employees simply for ensuring proper payment of her salary.

105.   Only Dr. Sontag Bowman's tenure protects her employment at UM.

106.   If not for her age and gender, Dr. Sontag Bowman would consider leaving UM because she has hit her career ceiling, deprived of the benefits of professional growth offered to her male counterparts, and under the constant threat of retaliation.

107.   Before President Bodnar's tenure at UM, Dr. Sontag Bowman did not experience limitations. During President Bodnar's tenure, her career path hit a brick wall.

108.   As a result of Defendants' actions, Dr. Sontag Bowman has been damaged.

## Rhondie Voorhees

109.   In July 2012, UM hired Dr. Voorhees as the Dean of Students.

110.   Dr. Voorhees is a Missoula native and graduate of UM.

111.   Dr. Voorhees has a Ph.D. in College Student Personnel Administration and Higher Education, M.A. in College Student Personnel, and B.A. in Psychology. *See* Curriculum Vitae Rhondie L. Voorhees, Ph.D. (Exhibit 4) (discussing Dr. Voorhees' education and experience; contact information redacted).

112.   She has over 30-years of experience working in higher education.

113.   In 2002, Dr. Voorhees served as legislative assistant on Title IX and other

issues to Congresswomen Patsy T. Mink in the U.S. House of Representatives.  In

1972, Congresswoman Mink co-wrote Title IX. Dr. Voorhees assisted

Congresswoman Mink in writing her last historical reflection on Title IX,

published in the *Congressional Record* on July 17, 2002.[1]

114.   As Dean of Students, Dr. Voorhees served as a key member of a team of 14

student affairs offices and directors, including serving as UM's chief student

conduct officer, a member of the Behavioral Intervention Team (BIT), a member

of the Title IX case review team, and Chair of the Admissions Review Committee.

115.   Dr. Voorhees's responsibilities included providing direct support and

advocacy for students and families at UM.

116.   Dr. Voorhees took her role to ensure the safety and security of the student

body very seriously.

117.   UM hired Dr. Voorhees while the U.S. Department of Education and

Department of Justice investigated the sexual assault scandal at UM.

118.   As a result, UM involved Dr. Voorhees in discussions, policy revisions, and

many aspects of UM's response to the U.S. Department of Education and

---

[1] After Congresswoman Mink's death and in her honor, the U.S. Congress passed the "Patsy T. Mink Gender Equity in Education Act of 2016," which seeks to support the full implementation of Title IX.

Department of Justice investigations.  Dr. Voorhees evaluated both past and current student cases.

119.   In this role, Dr. Voorhees became aware of many concerning situations and often alerted UM of Title IX violations and safety issues. She made repeated efforts to bring to light many concerns she had regarding student and campus safety, especially for female students and faculty, as well as for her own safety as Dean of Students.

120.   Despite the importance of the safety of UM's students and campus, and the need for compliance with Title IX, Dr. Voorhees's reports were often met with conflict, minimized, and/or entirely disregarded.

121.   Acting through Lucy France, now UM's Legal Counsel, and other leaders, UM often overrode Dr. Voorhees' decisions to keep the campus safe. Ms. France made decisions, took actions, and guided and/or advised senior administrators, including the President towards decisions that put the safety of the campus, students, and community members, especially women, at risk.  For example:

a.      In 2012/2013, a female student disclosed to Dr. Voorhees that she had been raped by a male student.  Dr. Voorhees advised the student that she would have the Title IX Coordinator, then Lucy France, call her.  Ms. France responded that the student would need to make a written report and refused

to confirm whether Ms. France would call her. Dr. Voorhees challenged Ms. France on this process.

b.      In 2013, Dr. Voorhees received a report that a female student was threatening a male instructor because she was romantically infatuated with him. As Dean of Students, Dr. Voorhees recommended expulsion as a sanction due to the severity of the circumstances. Ms. France advised President Engstrom on this matter, and under Ms. France's advice and guidance, the President overruled Dr. Voorhees' recommendation and reduced the sanction.

c.      In 2014, Dr. Voorhees was notified that a male student had been involved in an incident implicating felony criminal charges, had drug and alcohol addiction issues, and that his behavior was not in control. This student also missed a procedural deadline for his admission.  Given the missed deadline and security and safety concerns, Dr. Voorhees, as Chair of the Admissions Review Committee, denied him admission to UM. Ms. France, now Legal Counsel for UM, intervened and forced Dr. Voorhees to present the student's request to the Admissions Review Committee, who then admitted the student.  Dr. Voorhees was later devastated to learn her concerns about the male student were substantiated because another female student reported that the student had raped her.

d.     In 2015, a previous male student applied for readmission.  This applicant: (i) was a convicted felon recently released from prison; (ii) had a history of violently threatening female authority figures and harassing female students and faculty; (iii) had suspected serious mental illness; (iv) stalked a female faculty member; and (v) threatened to rape and kill another official and her family.  Ultimately, the Admissions Review Committee (chaired by Dr. Voorhees) decided they would not hear this case because of the fear of being involved.  Instead, the Committee developed a strategy to deny the applicant admission because this student presented a significant threat to campus, especially to women. Upon appeal, Ms. France and another administrator overruled the Committee's recommendations.

e.     In 2018, after a suspension, a male student had defamed Dr. Voorhees and other UM officials online with bizarre behavior and writing.  UM failed to keep Dr. Voorhees appraised of the dismissal of his complaints.

f.     In 2017 into 2018, Dr. Voorhees, and other UM officials, were working with a male student with a felony background.  She had suspended him due to his extreme bullying, aggressive, argumentative, demanding, and threatening behaviors toward various people and offices across the campus, especially women.  Dr. Voorhees had issued multiple no contact orders for women employees and students.  This student repeatedly complained to and

25

abused Dr. Voorhees online and verbally. The student was ultimately
incarcerated again and later released. Typical for these matters, Dr.
Voorhees had issued a "no trespass order" prohibiting this student from
being at UM. Ms. France requested information regarding the "no trespass
order", to which Dr. Voorhees explained that the student was such a threat to
campus and herself personally that others advised her to receive a personal
order of protection against him. Shortly after Dr. Voorhees's reply to Ms.
France, UM eliminated the Dean of Students position.

122.    During her tenure at UM, Dr. Voorhees clearly and repeatedly
communicated with UM through human resources and her supervisors her
experiences, including her fears of retaliation, and safety and security concerns for
the UM community.

123.    Dr. Voorhees's efforts to fulfill her obligations under Title IX and to the UM
community subjected her to retaliation, culminating in the elimination of her
position and employment with UM.

124.    Ms. France, exerted her influence over Dr. Voorhees' supervisors in
retaliation against Dr. Voorhees for speaking out and doing her job.

125.    On August 14, 2018, under the pre-text of reorganizing, UM eliminated the
Dean of Students position and terminated Dr. Voorhees's contract. UM
immediately placed Dr. Voorhees on administrative leave.

126.   Unlike the treatment provided to her male colleagues when leaving a position at UM, after placing Dr. Voorhees on administrative leave, UM unnecessarily humiliated Dr. Voorhees denying her access to her office, computer, email, and files, forcing her to leave the building, and escorting her to the parking lot.

127.   UM paid Dr. Voorhees for another 10-months, while prohibiting her from working, through June 30, 2019, when her contract term expired.

128.   At this time, Dr. Voorhees was an employee in good standing at UM, with a blemish free record. The Defendants never accused Dr. Voorhees of any wrongdoing.

129.   Despite Dr. Voorhees' dedication to protecting the UM community from dangerous individuals, UM retaliated against Dr. Voorhees for confronting these important issues.

130.   As a result of Defendants' mishandling of Dr. Voorhees's termination, she has been defamed by a student in Arizona and her reputation and career have been forever tarnished.

131.   As a result of Defendants' actions, Dr. Voorhees has been damaged.

\\\   \\\   \\\

27

## **Class Action**

132.   Plaintiffs have standing to bring this class action because they are members of the defined class, have the same interest as all class members, and have suffered the same injury as the class members.

133.   The facts stated above are common to all class members.

### *Class Description*

134.   The class description is identifiable individuals who:

a.   were employed by the Defendants at any point since 2013,

b.   experienced harassment, retaliation, and/or discrimination "on the basis of sex," and

c.   the individual was:

   i.   forced to resign,

   ii.   the Defendants terminated their position, and/or

   iii.   the Defendants created no, or limited, options for professional growth.

135.   In order to be certified, a class has to comply with the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the prerequisites of Federal Rule of Civil Procedure 23(b).  As described in the following paragraphs, this class satisfies all elements.

\\\   \\\   \\\

## *Federal Rule of Civil Procedure 23(a)(1)*

136.    Under Federal Rule of Civil Procedure 23(a)(1), a class may be certified if: "the class is so numerous that joinder of all members is impracticable."

137.    Upon information and belief, the Defendants have engaged in the above described discriminatory conduct since at least 2013 and that these actions continue today.

138.    Plaintiffs are aware of many other women who have experienced the same harassing, discriminatory, and retaliatory conduct, but continue to fear retaliation by joining this litigation as a named plaintiff.  This number has grown even within the short period since Plaintiffs filed their original Complaint & Jury Trial Demand on August 4, 2021.  To date, Plaintiffs and their counsel have been contacted by 18 additional women directly and been advised of at least 6 other women who have shared experiences of the Defendants' harassing, discriminatory, and retaliatory conduct.

139.    Putative class members will likely come forward and share their experiences at different times, making it judicially efficient to amend the Complaint once to include class claims, rather than repeated amendments with additional plaintiffs.

140.    "Fear of retaliation—in, for example, civil rights or employment cases—is an additional factor that occasionally argues for relaxing the numerosity requirement generally (not just in terms of sheer numbers of class members), as

such a fear might deter potential plaintiffs from suing individually, making a representative action especially pertinent." William B. Rubenstein, 1 *Newberg on Class Actions* § 3:12 (5th ed.) (June 2021 Update).

141. Defendants' culture of retaliation and intimidation against women who speak out continues today. Defendants' disingenuous attempts to discredit the named Plaintiffs directly threatens and discourages other potential plaintiffs from joining this lawsuit. Understandably, many women fear publicly joining this lawsuit because of these threats, which makes joinder of all class members impracticable.

142. Upon information and belief, the Defendants have discriminated against multiple dozens, if not hundreds, of women, limiting and adversely impacting their career paths and opportunities.

143. Upon information and belief, the Defendants have discriminated against multiple dozens, if not hundreds, of women, creating a brick wall for their careers.

144. Given the duration of this conduct, it is certain that a large number of women have been adversely affected by the Defendants' actions.

145. Given many of the named Plaintiffs were forced to move out of Montana because of the Defendants' actions, it is likely that the class members are geographically disperse, living outside of Montana and even outside of the United States.

146.   The applicable law and facts in this case are common to all class members.

147.   Numerosity, interests of judicial economy, geographically disperse class members, and the fear of retaliation indicate that joinder of all class members is impracticable in this matter.

### *Federal Rule of Civil Procedure 23(a)(2)*

148.   Under Federal Rule of Civil Procedure 23(a)(2), a class may be certified if: "there are questions of law or fact common to the class."

149.   The operative questions of law and fact, which are presented by this action, are common to all members of the class.

150.   This case addresses whether the Defendants violated the rights of the Plaintiffs and class members by failing to comply with Title IX, their own policies, and state law. These are common questions of law.

151.    The fact that the class members all suffered from gender discrimination, harassment, and retaliation, violating Title IX, the Defendants' policies, and state law, are common questions of fact.

152.   The questions of law and fact are common to the class.

### *Federal Rule of Civil Procedure 23(a)(3)*

153.   Under Federal Rule of Civil Procedure 23(a)(3), a class may be certified if: "the claims or defenses of the representative parties are typical of the claims or defenses of the class."

154.   Plaintiffs' claims are typical of the claims of all class members in that their claims arise from the same course of conduct giving rise to the claims of other class members.

155.   Plaintiffs and the putative class were damaged when the Defendants discriminated, harassed, and retaliated against them "on the basis of sex."

156.   The legal theories that form the basis of the claims brought by Plaintiffs are identical to the legal theories that form the basis of the claims of all class members.

157.   The Plaintiffs' claims are typical of the claims of the class.

### *Federal Rule of Civil Procedure 23(a)(4)*

158.   Under Federal Rule of Civil Procedure 23(a)(4), a class may be certified if: "the representative parties will fairly and adequately protect the interests of the class."

159.   Plaintiffs are members of the class.  Plaintiffs and all class members have suffered losses and have been damaged as a result of the Defendants' actions.

160.   Plaintiffs' interests are identical to, and not antagonistic towards, those of other class members.

161.   Plaintiffs have a personal financial stake in the outcome of this lawsuit, are dedicated to ensuring that the Defendants' conduct ends and does not continue in the future, and are committed to conscientiously representing the class.

162.   Plaintiffs have retained qualified, experienced counsel who are able to

conduct this litigation.  They are licensed to practice law in Montana and are

attorneys in good standing.  The undersigned attorneys hereby certify that they will

fairly and adequately protect the interests of the class.

163.   Plaintiffs and the undersigned counsel will fairly and adequately protect the

interests of the class.

### *Federal Rule of Civil Procedure 23(b)(1)*

164.   Under Federal Rule of Civil Procedure 23(b)(1), a class may be certified if:

> prosecuting separate actions by or against individual class members
> would create a risk of:
> (A) inconsistent or varying adjudications with respect to individual
> class members that would establish incompatible standards of conduct
> for the party opposing the class; or
> (B) adjudications with respect to individual class members that, as a
> practical matter, would be dispositive of the interests of the other
> members not parties to the individual adjudications or would
> substantially impair or impede their ability to protect their interests….

165.   The class is large in number and widely geographically dispersed throughout

Montana, the United States, and other countries, given how long the Defendants

have been acting illegally.

166.   The Plaintiffs seek to change the Defendants conduct. Multiple adjudications

would create differing and incompatible determinations regarding the Defendants'

conduct and the remedies for such, which would substantially impair the ability for

the Plaintiffs and/or putative class to protect their interests.

*Federal Rule of Civil Procedure 23(b)(2)*

167.   Under Federal Rule of Civil Procedure 23(b)(2), a class may be certified if Defendants have: "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole…."

168.   Here, Plaintiffs and the putative class seek injunctive and declaratory relief, which would affect all class members' rights.

169.   The Defendants' actions have acted in a manner applicable to the class as a whole.  Therefore, it is appropriate that the injunctive and declaratory relief requested by Plaintiffs be applied to the class as a whole.

170.   The Plaintiffs and putative class seek to end this discriminatory conduct and ensure that it does not continue in the future.  The injunctive and declaratory relief sought are important remedies and should benefit the entire class population.

*Federal Rule of Civil Procedure 23(b)(3)*

171.   Under Federal Rule of Civil Procedure 23(b)(3), a class may be certified if: "the questions of law and fact common to class members predominate over any questions affecting only individual members, and … a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

172.   Given the fears of retaliation and benefits of anonymity, class members have little interest in individually controlling this litigation, but rather benefit from a representative class action.

173.   There is no other known litigation involving the putative class.

174.   There is no other appropriate forum for this litigation.

175.   There are no known difficulties of managing this class action.

176.   Given the potential for some class members to have relatively low monetary value damages, the economic realities direct that this matter should proceed as a class action or not at all.

177.   The legal and factual issues of the class members predominate those affecting individual members, and this class action is the superior method to litigate this matter fairly and efficiently.

## Count 1 –Violation of Title IX

178.   Plaintiffs, individually and on behalf of all others similarly situated, reallege all the facts set out in foregoing paragraphs and alternate counts of this Complaint.

179.   Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*., provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. …

> [A]n educational institution means any public or private preschool,
> elementary, or secondary school, or any institution of vocational,
> professional, or higher education, except that in the case of an
> educational institution composed of more than one school, college,
> or department which are administratively separate units, such term
> means each such school, college, or department.

180.   The Defendants receive federal funding and financial assistance within the

meaning of 20 U.S.C. § 1681(a), subjecting them to the requirements of Title IX.

181.   Defendants had notice when they accepted federal funding under Title IX

that they would be liable for its actions that violate Title IX, including gender

discrimination, harassment, and retaliation.

182.   Plaintiffs and the putative class are members of a protected class.

183.   The Defendants had actual knowledge of the persistent violations of Title

IX, including the allegations outlined above.

184.   The Defendants were deliberately indifferent to these allegations, and failed

to take any action to remedy the situations in violation of their policies and Title

IX.

185.   The Defendants frequently subjected Plaintiffs and the putative class to

unwelcome harassment, retaliation, and humiliation, "on the basis of sex," with

such severity, pervasiveness, and objective offensiveness that it created an abusive

work environment and interfered, and continues to interfere, with the Plaintiffs'

and the putative class' work performance.

186.    The Defendants created an unsafe work environment for the Plaintiffs and the putative class because UM failed to provide a work environment free from physical, financial, and professional threats and retaliation based on gender.

187.    The Defendants failure to comply with Title IX has damaged and threatened Plaintiffs' and the putative class' financial security, career security, and physical security.

188.    The Defendants knew, or should have known, that "on the basis of sex," the Plaintiffs and the putative class were "excluded from participation in[,] denied the benefits of[, and] subjected to discrimination" at UM.

189.    The Defendants should have immediately taken action to:

    a.      End the harassment,

    b.      Eliminate the hostile environment,

    c.      Prevent recurrence, and

    d.      Remedy the effects.

190.    The Defendants failed to take any of these actions in violation of their policies and Title IX.

191.    Instead, Defendants took adverse action against the Plaintiffs and the putative class, forcing Plaintiffs and the putative class to resign, terminating their position, and/or creating no options for professional growth.  All of these actions evidence the Defendants' failure to adequately respond.

192.   Plaintiffs and the putative class were qualified for their positions, and were subjected to adverse employment actions despite their qualifications.

193.   Similarly situated men in Plaintiffs' and the putative class' roles did not receive the same treatment as Plaintiffs and the putative class.

194.   Defendants retaliated against the Plaintiffs and the putative class based on gender.

195.   Defendants created such a seriously hostile environment "on the basis of sex" that Defendants denied and/or limited the Plaintiffs' and the putative class' participation in its programs and activities.

196.   Defendants' actions directly violated their policies and federal law.

197.   As a result of Defendants' actions, the Plaintiffs and the putative class have been damaged in an amount to be determined at trial.

### <u>Count 2-Breach of Covenant of Good Faith and Fair Dealing</u>

198.   Plaintiffs, individually and on behalf of all others similarly situated, reallege all the facts set out in the foregoing paragraphs and alternate counts of this Complaint.

199.   Defendants entered into contracts with Plaintiffs and the putative class.

200.   Each contract contains an implied covenant of good faith and fair dealing.

201.   Breach of the covenant is a breach of the contract.

202.   A breach of an express term of the contract is not a prerequisite to a breach of the implied covenant.

203.   The conduct required by the implied covenant is honesty in fact and the observance of reasonable standards of fair dealing in the trade.

204.   Defendants breached the implied covenant of good faith and fair dealing by depriving Plaintiffs and the putative class the Title IX benefits to which they were lawfully entitled.

205.   As a result of Defendants' actions, the Plaintiffs and the putative class have been damaged in an amount to be determined at trial.

## Jury Trial Demand

Plaintiffs and the putative class hereby demand trial by jury on all issues.

## Prayer for Relief

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray judgment against all Defendants, jointly and severally, as follows:

1.   For a judgment in favor of Plaintiffs and the putative class and against Defendants on all Counts.

2.   As soon as practicable determine by order that this class action may be maintained, as set forth in Federal Rule of Civil Procedure 23(c).

3.    For certification of the Class Action pursuant to the Federal Rules of Civil Procedure, and a class of identifiable individuals who:

a.     were employed by the Defendants at any point since 2013,

b.     experienced harassment, retaliation, and/or discrimination "on the basis of sex," and

c.     the individual was:

      i.     forced to resign,

      ii.     the Defendants terminated their position, and/or

      iii.     the Defendants created no, or limited, options for professional growth.

4.     For an order requiring the Defendants, at their expense, to identify and advise each and every class member of this lawsuit and their potential entitlement to damages.

5.     For an order requiring the Defendants to identify and pay the Plaintiffs and class members damages in a reasonable amount to compensate the Plaintiffs and class members for all harm they have suffered as a result of the Defendants' conduct.

6.     For injunctive relief ordering the Defendants to calculate the amount of damages owed to Plaintiffs and the class members.

7.     For injunctive relief ordering the Defendants to pay such amount plus interest.

8.     For declaratory judgment declaring Defendants' discriminatory practices violate Title IX, their policies, and Montana law.

9.     For injunctive relief directing Defendants to cease these discriminatory practices and to implement procedures and policies to ensure that these discriminatory practices do not occur in the future.

10.     For compensatory damages in an amount to be determined at trial to compensate Plaintiffs and the class members.

11.     For damages in an amount to be determined at trial to compensate Plaintiffs and the class members for all past, present, and future mental anguish and emotional distress.

12.     For an incentive award for the named Plaintiffs and class representatives.

13.     For all costs, including but not limited to expert fees, incurred in the prosecution of this action.

14.     For an award of interest, as deemed appropriate by the Court and as allowed by law.

15.     For an award of attorney's fees, as the same may be allowed by law.

16.     For such other and further relief, both at law and in equity, as the Court shall deem just and proper.

\\\   \\\   \\\

Dated this 19th day of August, 2021.

BLACKFORD CARLS P.C.

/s/  Hillary P. Carls
/s/  Sherine D. Blackford
Hillary P. Carls
Sherine D. Blackford
*Attorneys for Plaintiffs*

Marc J. Randazza (AZ Bar No. 027861)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
Telephone: 702-420-2001
ecf@randazza.com

Attorneys for Defendants
Audrey Davis and John Jacob Howe

**SUPERIOR COURT, STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF YAVAPAI**

|  |  |
|---|---|
| **RHONDIE VOORHEES**, an individual, | Case No. P1300CV202100396 |
| Plaintiff, | Dept. 2 |
| v. | **DECLARATION OF ALEX J. SHEPARD** |
| **AUDREY DAVIS**, an individual, and **JOHN JACOB HOWE**, an individual | |
| Defendant. | |

I, Alex J. Shepard, declare:

1.    I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty.  I have first-hand knowledge of the facts set forth herein, and if called as a witness, could and would testify competently thereto.

2.    I am an attorney licensed to practice in the States of Nevada and California. I am an associate attorney with Randazza Legal Group, PLLC ("RLG"), counsel for Defendant Audrey Davis.

3.    I provide this declaration in support of Defendant Audrey Davis's  Motion to Dismiss.

4.    On October 7, 2021 at 3:48 p.m. Pacific time, while at the Las Vegas Office of RLG, and while using a MacBook Air laptop with the Google Chrome internet browser,

I visited the Billings Gazette website and navigated to the page displaying Keila Szpaller, "Transgender student drops out, alleges discrimination at Missoula College," BILLINGS GAZETTE (Aug. 9, 2015), at the url: https://billingsgazette.com/news/state-and-regional/montana/transgender-student-drops-out-alleges-discrimination-at-missoula-college/article_a57b17cd-4b32-5be1-8a61-3201439a137d.html.   Immediately after viewing this page, I created a copy of the contents of this page using the Chrome browser's print to PDF function.  A true and correct copy of this printout is attached to the Motion to Dismiss as **Exhibit A**.

5.      On October 7, 2021 at 3:49 p.m. Pacific time, while at the Las Vegas Office of RLG, and while using a MacBook Air laptop with the Google Chrome internet browser, I visited the Missoulian website and navigated to the page displaying Keila Szpaller, "University of Montana Dean of Students asked to leave," MISSOULIAN (Aug. 20, 2018), at the url: https://missoulian.com/news/local/university-of-montana-dean-of-students-asked-to-leave/article_cbcd2362-f723-5c73-9e8f-e88a6835d705.html.  Immediately after viewing this page, I created a copy of the contents of this page using the Chrome browser's print to PDF function.  A true and correct copy of this printout is attached to the Motion to Dismiss as **Exhibit B**.

6.      On October 7, 2021 at 1:05 p.m. Pacific time, while at the Las Vegas Office of RLG, and while using a MacBook Air laptop with the Google Chrome internet browser, I visited the "Meet the Dean of Students" page on the Embry-Riddle Aeronautical University, Prescott, Arizona website, at the url: https://prescott.erau.edu/campus-life/dean-of-students.  Immediately after viewing this page, I created a copy of the contents of this page using the Chrome browser's print to PDF function.  A true and correct copy of this printout is attached to the Motion to Dismiss as **Exhibit C**.

1       I declare under penalty of perjury under the law of the State of Arizona that the

2  foregoing is true and correct.

3

4       Executed on October 7, 2021.

5                              _____

6                               Alex J. Shepard

Declaration of Alex J. Shepard

P1300CV202100396